# STANFORD *v.* KENTUCKY

No. 87–5765.   Argued March 27, 1989—Decided June 26, 1989*

*Together with No. 87–6026, *Wilkins* v. *Missouri,* on certiorari to the Supreme Court of Missouri.

SCALIA, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III, and IV–A, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and KENNEDY, JJ., joined, and an opinion with respect to Parts IV–B and V, in which REHNQUIST, C. J., and WHITE and KENNEDY, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 380. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 382.

*Frank W. Heft, Jr.*, argued the cause for petitioner in No. 87–5765. With him on the briefs were *J. David Niehaus* and *Daniel T. Goyette*. *Nancy A. McKerrow* argued the cause and filed briefs for petitioner in No. 87–6026.

*Frederic J. Cowan*, Attorney General of Kentucky, argued the cause for respondent in No. 87–5765. With him on the brief were *Elizabeth Ann Myerscough* and *David A. Smith*, Assistant Attorneys General. *John M. Morris III*, Assist-

ant Attorney General of Missouri, argued the cause for respondent in No. 87–6026. With him on the brief was *William L. Webster*, Attorney General.†

JUSTICE SCALIA announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III, and IV–A, and an opinion with respect to Parts IV–B and V, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE KENNEDY join.

These two consolidated cases require us to decide whether the imposition of capital punishment on an individual for a

---

†Briefs of *amici curiae* urging reversal in both cases were filed for the American Baptist Churches et al. by *Mark Evan Olive;* for the Child Welfare League of America et al. by *Randy Hertz* and *Martin Guggenheim;* and for the West Virginia Council of Churches by *Paul R. Stone.*

A brief of *amici curiae* urging affirmance in No. 87–6026 was filed for the State of Kentucky et al. by *Frederic J. Cowan*, Attorney General of Kentucky, *Elizabeth Ann Myerscough* and *David A. Smith*, Assistant Attorneys General, *Don Siegelman*, Attorney General of Alabama, *Robert K. Corbin*, Attorney General of Arizona, *John Steven Clark*, Attorney General of Arkansas, *John J. Kelly*, Chief State's Attorney of Connecticut, *Robert A. Butterworth*, Attorney General of Florida, *Linley E. Pearson*, Attorney General of Indiana, *Michael C. Moore*, Attorney General of Mississippi, *Michael T. Greely*, Attorney General of Montana, *Brian McKay*, Attorney General of Nevada, *Robert H. Henry*, Attorney General of Oklahoma, *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, *T. Travis Medlock*, Attorney General of South Carolina, *Roger A. Tellinghuisen*, Attorney General of South Dakota, *Mary Sue Terry*, Attorney General of Virginia, and *Joseph B. Meyer*, Attorney General of Wyoming.

Briefs of *amici curiae* were filed in both cases for the American Bar Association by *Robert D. Raven* and *Andrew J. Shookhoff;* for the American Society for Adolescent Psychiatry et al. by *Joseph T. McLaughlin, Jeremy G. Epstein,* and *Henry Weisburg;* for Amnesty International by *Paul L. Hoffman, Joan W. Howarth, Mary E. McClymont, David Weissbrodt,* and *John E. Osborn;* for Defense for Children International-USA by *Anna Mamalakis Pappas;* for the International Human Rights Law Group by *Robert H. Kapp;* and for the National Legal Aid and Defender Association et al. by *Charles Ogletree* and *John H. Blume.* *Susan Apel* and *Michael Mello* filed a brief for the Office of the Capital Collateral Representative for the State of Florida as *amicus curiae* in No. 87–5765.

crime committed at 16 or 17 years of age constitutes cruel and unusual punishment under the Eighth Amendment.

I

The first case, No. 87–5765, involves the shooting death of 20-year-old Barbel Poore in Jefferson County, Kentucky. Petitioner Kevin Stanford committed the murder on January 7, 1981, when he was approximately 17 years and 4 months of age. Stanford and his accomplice repeatedly raped and sodomized Poore during and after their commission of a robbery at a gas station where she worked as an attendant. They then drove her to a secluded area near the station, where Stanford shot her pointblank in the face and then in the back of her head. The proceeds from the robbery were roughly 300 cartons of cigarettes, two gallons of fuel, and a small amount of cash. A corrections officer testified that petitioner explained the murder as follows: " '[H]e said, I had to shoot her, [she] lived next door to me and she would recognize me. . . . I guess we could have tied her up or something or beat [her up] . . . and tell her if she tells, we would kill her. . . . Then after he said that he started laughing.' " 734 S. W. 2d 781, 788 (Ky. 1987).

After Stanford's arrest, a Kentucky juvenile court conducted hearings to determine whether he should be transferred for trial as an adult under Ky. Rev. Stat. Ann. § 208.170 (Michie 1982). That statute provided that juvenile court jurisdiction could be waived and an offender tried as an adult if he was either charged with a Class A felony or capital crime, or was over 16 years of age and charged with a felony. Stressing the seriousness of petitioner's offenses and the unsuccessful attempts of the juvenile system to treat him for numerous instances of past delinquency, the juvenile court found certification for trial as an adult to be in the best interest of petitioner and the community.

Stanford was convicted of murder, first-degree sodomy, first-degree robbery, and receiving stolen property, and was sentenced to death and 45 years in prison. The Kentucky Supreme Court affirmed the death sentence, rejecting Stanford's "deman[d] that he has a constitutional right to treatment." 734 S. W. 2d, at 792. Finding that the record clearly demonstrated that "there was no program or treatment appropriate for the appellant in the juvenile justice system," the court held that the juvenile court did not err in certifying petitioner for trial as an adult. The court also stated that petitioner's "age and the possibility that he might be rehabilitated were mitigating factors appropriately left to the consideration of the jury that tried him." *Ibid.*

The second case before us today, No. 87–6026, involves the stabbing death of Nancy Allen, a 26-year-old mother of two who was working behind the sales counter of the convenience store she and David Allen owned and operated in Avondale, Missouri. Petitioner Heath Wilkins committed the murder on July 27, 1985, when he was approximately 16 years and 6 months of age. The record reflects that Wilkins' plan was to rob the store and murder "whoever was behind the counter" because "a dead person can't talk." While Wilkins' accomplice, Patrick Stevens, held Allen, Wilkins stabbed her, causing her to fall to the floor. When Stevens had trouble operating the cash register, Allen spoke up to assist him, leading Wilkins to stab her three more times in her chest. Two of these wounds penetrated the victim's heart. When Allen began to beg for her life, Wilkins stabbed her four more times in the neck, opening her carotid artery. After helping themselves to liquor, cigarettes, rolling papers, and approximately $450 in cash and checks, Wilkins and Stevens left Allen to die on the floor.

Because he was roughly six months short of the age of majority for purposes of criminal prosecution, Mo. Rev. Stat. § 211.021(1) (1986), Wilkins could not automatically be

tried as an adult under Missouri law. Before that could happen, the juvenile court was required to terminate juvenile court jurisdiction and certify Wilkins for trial as an adult under § 211.071, which permits individuals between 14 and 17 years of age who have committed felonies to be tried as adults. Relying on the "viciousness, force and violence" of the alleged crime, petitioner's maturity, and the failure of the juvenile justice system to rehabilitate him after previous delinquent acts, the juvenile court made the necessary certification.

Wilkins was charged with first-degree murder, armed criminal action, and carrying a concealed weapon. After the court found him competent, petitioner entered guilty pleas to all charges. A punishment hearing was held, at which both the State and petitioner himself urged imposition of the death sentence. Evidence at the hearing revealed that petitioner had been in and out of juvenile facilities since the age of eight for various acts of burglary, theft, and arson, had attempted to kill his mother by putting insecticide into Tylenol capsules, and had killed several animals in his neighborhood. Although psychiatric testimony indicated that Wilkins had "personality disorders," the witnesses agreed that Wilkins was aware of his actions and could distinguish right from wrong.

Determining that the death penalty was appropriate, the trial court entered the following order:

> "[T]he court finds beyond reasonable doubt that the following aggravating circumstances exist:
>
> "1. The murder in the first degree was committed while the defendant was engaged in the perpetration of the felony of robbery, and
>
> "2. The murder in the first degree involved depravity of mind and that as a result thereof, it was outrageously or wantonly vile, horrible or inhuman." App. in No. 87–6026, p. 77.

On mandatory review of Wilkins' death sentence, the Supreme Court of Missouri affirmed, rejecting the argument that the punishment violated the Eighth Amendment. 736 S. W. 2d 409 (1987).

We granted certiorari in these cases, 488 U. S. 887 (1988) and 487 U. S. 1233 (1988), to decide whether the Eighth Amendment precludes the death penalty for individuals who commit crimes at 16 or 17 years of age.

## II

The thrust of both Wilkins' and Stanford's arguments is that imposition of the death penalty on those who were juveniles when they committed their crimes falls within the Eighth Amendment's prohibition against "cruel and unusual punishments." Wilkins would have us define juveniles as individuals 16 years of age and under; Stanford would draw the line at 17.

Neither petitioner asserts that his sentence constitutes one of "those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted." *Ford* v. *Wainwright*, 477 U. S. 399, 405 (1986). Nor could they support such a contention. At that time, the common law set the rebuttable presumption of incapacity to commit any felony at the age of 14, and theoretically permitted capital punishment to be imposed on anyone over the age of 7. See 4 W. Blackstone, Commentaries *23–*24; 1 M. Hale, Pleas of the Crown 24–29 (1800). See also *In re Gault*, 387 U. S. 1, 16 (1967); Streib, Death Penalty for Children: The American Experience with Capital Punishment for Crimes Committed While Under Age Eighteen, 36 Okla. L. Rev. 613, 614–615 (1983); Kean, The History of the Criminal Liability of Children, 53 L. Q. Rev. 364, 369–370 (1937). In accordance with the standards of this common-law tradition, at least 281 offenders under the age of 18 have been executed in this country, and at least 126 under the age of 17. See V. Streib, Death Penalty for Juveniles 57 (1987).

Thus petitioners are left to argue that their punishment is contrary to the "evolving standards of decency that mark the progress of a maturing society," *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion). They are correct in asserting that this Court has "not confined the prohibition embodied in the Eighth Amendment to 'barbarous' methods that were generally outlawed in the 18th century," but instead has interpreted the Amendment "in a flexible and dynamic manner." *Gregg* v. *Georgia*, 428 U. S. 153, 171 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.). In determining what standards have "evolved," however, we have looked not to our own conceptions of decency, but to those of modern American society as a whole.[1] As we have said, "Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgment should be informed by objective factors to the maximum possible extent." *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977) (plurality opinion). See also *Penry* v. *Lynaugh, ante*, at 331; *Ford* v. *Wainwright, supra*, at 406; *Enmund* v. *Florida*, 458 U. S. 782, 788–789 (1982); *Furman* v. *Georgia*, 408 U. S. 238, 277–279 (1972) (BRENNAN, J., concurring). This approach is dictated both by the language of the Amendment—which proscribes only those punishments that are both "cruel and *unusual*"—and by the "deference we owe to the decisions

---

[1] We emphasize that it is *American* conceptions of decency that are dispositive, rejecting the contention of petitioners and their various *amici* (accepted by the dissent, see *post,* at 389–390) that the sentencing practices of other countries are relevant. While "[t]he practices of other nations, particularly other democracies, can be relevant to determining whether a practice uniform among our people is not merely a historical accident, but rather so 'implicit in the concept of ordered liberty' that it occupies a place not merely in our mores, but, text permitting, in our Constitution as well," *Thompson* v. *Oklahoma*, 487 U. S. 815, 868–869, n. 4 (1988) (SCALIA, J., dissenting), quoting *Palko* v. *Connecticut*, 302 U. S. 319, 325 (1937) (Cardozo, J.), they cannot serve to establish the first Eighth Amendment prerequisite, that the practice is accepted among our people.

of the state legislatures under our federal system," *Gregg* v. *Georgia, supra,* at 176.

## III

"[F]irst" among the "'objective indicia that reflect the public attitude toward a given sanction'" are statutes passed by society's elected representatives. *McCleskey* v. *Kemp,* 481 U. S. 279, 300 (1987), quoting *Gregg* v. *Georgia, supra,* at 173. Of the 37 States whose laws permit capital punishment, 15 decline to impose it upon 16-year-old offenders and 12 decline to impose it on 17-year-old offenders.[2] This does

---

[2] The following States preclude capital punishment of offenders under 18: California (Cal. Penal Code Ann. § 190.5 (West 1988)); Colorado (Colo. Rev. Stat. § 16–11–103(1)(a) (1986)); Connecticut (Conn. Gen. Stat. § 53a–46a(g)(1) (1989)); Illinois (Ill. Rev. Stat., ch. 38, ¶ 9–1(b) (1987)); Maryland (Md. Ann. Code, Art. 27, § 412(f) (Supp. 1988)); Nebraska (Neb. Rev. Stat. § 28–105.01 (1985)); New Hampshire (N. H. Rev. Stat. Ann. § 630:5 (XIII) (Supp. 1988)); New Jersey (N. J. Stat. Ann. § 2A:4A–22(a) (West 1987) and 2C:11–3(g) (West Supp. 1988)); New Mexico (N. M. Stat. Ann. §§ 28–6–1(A), 31–18–14(A) (1987)); Ohio (Ohio Rev. Code Ann. § 2929.02(A) (1987)); Oregon (Ore. Rev. Stat. §§ 161.620 and 419.476(1) (1987)); Tennessee (Tenn. Code Ann. §§ 37–1–102(3), 37–1–102(4), 37–1–103, 37–1–134(a)(1) (1984 and Supp. 1988)). Three more States preclude the death penalty for offenders under 17: Georgia (Ga. Code Ann. § 17–9–3 (1982)); North Carolina (N. C. Gen. Stat. § 14–17 (Supp. 1988)); Texas (Tex. Penal Code Ann. § 8.07(d) (Supp. 1989)).

The dissent takes issue with our failure to include, among those States evidencing a consensus against executing 16- and 17-year-old offenders, the District of Columbia and the 14 States that do not authorize capital punishment. *Post,* at 384–385. It seems to us, however, that while the number of those jurisdictions bears upon the question whether there is a consensus against capital punishment altogether, it is quite irrelevant to the specific inquiry in this case: whether there is a settled consensus in favor of punishing offenders under 18 differently from those over 18 insofar as capital punishment is concerned. The dissent's position is rather like discerning a national consensus that wagering on cockfights is inhumane by counting within that consensus those States that bar all wagering. The issue in the present case is not whether capital punishment is thought to be desirable but whether persons under 18 are thought to be specially exempt from it. With respect to that inquiry, it is no more logical to say that the capital-

not establish the degree of national consensus this Court has previously thought sufficient to label a particular punishment cruel and unusual. In invalidating the death penalty for rape of an adult woman, we stressed that Georgia was the *sole* jurisdiction that authorized such a punishment. See *Coker* v. *Georgia, supra,* at 595–596. In striking down capital punishment for participation in a robbery in which an accomplice takes a life, we emphasized that only eight jurisdictions authorized similar punishment. *Enmund* v. *Florida, supra,* at 792. In finding that the Eighth Amendment precludes execution of the insane and thus requires an adequate hearing on the issue of sanity, we relied upon (in addition to the common-law rule) the fact that "no State in the Union" permitted such punishment. *Ford* v. *Wainwright,* 477 U. S., at 408. And in striking down a life sentence without parole under a recidivist statute, we stressed that "[i]t appears that [petitioner] was treated more severely than he would have been in any other State." *Solem* v. *Helm,* 463 U. S. 277, 300 (1983).

Since a majority of the States that permit capital punishment authorize it for crimes committed at age 16 or above,[3] petitioners' cases are more analogous to *Tison* v. *Arizona,* 481 U. S. 137 (1987), than *Coker, Enmund, Ford,* and *Solem.* In *Tison,* which upheld Arizona's imposition of the death penalty for major participation in a felony with reckless indifference to human life, we noted that only 11 of those ju-

---

punishment laws of those States which prohibit capital punishment (and thus do not address age) support the dissent's position, than it would be to say that the age-of-adult-criminal-responsibility laws of those same States (which do not address capital punishment) support our position.

[3] The dissent again works its statistical magic by refusing to count among the States that authorize capital punishment of 16- and 17-year-old offenders those 19 States that set no minimum age in their death penalty statute, and specifically permit 16- and 17-year-olds to be sentenced as adults. *Post,* at 385. We think that describing this position is adequate response.

risdictions imposing capital punishment rejected its use in such circumstances. *Id.*, at 154. As we noted earlier, here the number is 15 for offenders under 17, and 12 for offenders under 18. We think the same conclusion as in *Tison* is required in these cases.

Petitioners make much of the recently enacted federal statute providing capital punishment for certain drug-related offenses, but limiting that punishment to offenders 18 and over. The Anti-Drug Abuse Act of 1988, Pub. L. 100–690, 102 Stat. 4390, § 7001(l), 21 U. S. C. § 848(*l*) (1988 ed.). That reliance is entirely misplaced. To begin with, the statute in question does not embody a judgment by the Federal Legislature that *no* murder is heinous enough to warrant the execution of such a youthful offender, but merely that the narrow class of offense it defines is not. The congressional judgment on the broader question, if apparent at all, is to be found in the law that permits 16- and 17-year-olds (after appropriate findings) to be tried and punished as adults for *all* federal offenses, including those bearing a capital penalty that is not limited to 18-year-olds.[4] See 18 U. S. C. § 5032 (1982 ed., Supp. V). Moreover, even if it were true that no

---

[4] See 10 U. S. C. § 906a (1982 ed., Supp. V) (peacetime espionage); § 918 (murder by persons subject to Uniform Code of Military Justice); 18 U. S. C. §§ 32, 33, and 34 (1982 ed. and Supp. V) (destruction of aircraft, motor vehicles, or related facilities resulting in death); § 115(b)(3) (1982 ed., Supp. V) (retaliatory murder of member of immediate family of law enforcement officials) (by cross reference to § 1111 (1982 ed. and Supp. V)); § 351 (1982 ed. and Supp. V) (murder of Member of Congress, high-ranking executive official, or Supreme Court Justice) (by cross reference to § 1111); § 794 (1982 ed. and Supp. V) (espionage); § 844(f) (1982 ed., Supp. V) (destruction of Government property resulting in death); § 1111 (first-degree murder within federal jurisdiction); § 1716 (1982 ed. and Supp. V) (mailing of injurious articles resulting in death); § 1751 (assassination or kidnaping resulting in death of President or Vice President); § 1992 (willful wrecking of train resulting in death); § 2113 (1982 ed. and Supp. V) (bank robbery-related murder or kidnaping); § 2381 (treason); 49 U. S. C. App. §§ 1472 and 1473 (1982 ed. and Supp. V) (death resulting from aircraft hijacking).

federal statute permitted the execution of persons under 18, that would not remotely establish—in the face of a substantial number of state statutes to the contrary—a national consensus that such punishment is inhumane, any more than the absence of a federal lottery establishes a national consensus that lotteries are socially harmful. To be sure, the absence of a federal death penalty for 16- or 17-year-olds (if it existed) might be evidence that there is no national consensus *in favor* of such punishment. It is not the burden of Kentucky and Missouri, however, to establish a national consensus approving what their citizens have voted to do; rather, it is the "heavy burden" of petitioners, *Gregg* v. *Georgia*, 428 U. S., at 175, to establish a national consensus *against* it. As far as the primary and most reliable indication of consensus is concerned—the pattern of enacted laws—petitioners have failed to carry that burden.

## IV

### A

Wilkins and Stanford argue, however, that even if the laws themselves do not establish a settled consensus, the application of the laws does. That contemporary society views capital punishment of 16- and 17-year-old offenders as inappropriate is demonstrated, they say, by the reluctance of juries to impose, and prosecutors to seek, such sentences. Petitioners are quite correct that a far smaller number of offenders under 18 than over 18 have been sentenced to death in this country. From 1982 through 1988, for example, out of 2,106 total death sentences, only 15 were imposed on individuals who were 16 or under when they committed their crimes, and only 30 on individuals who were 17 at the time of the crime. See Streib, Imposition of Death Sentences For Juvenile Offenses, January 1, 1982, Through April 1, 1989, p. 2 (paper for Cleveland-Marshall College of Law, April 5, 1989). And it appears that actual executions for crimes committed under age 18 accounted for only about two percent of the total number of executions that occurred between 1642

and 1986.   See Streib, Death Penalty for Juveniles, at 55, 57.
As Wilkins points out, the last execution of a person who
committed a crime under 17 years of age occurred in 1959.
These statistics, however, carry little significance.   Given
the undisputed fact that a far smaller percentage of capital
crimes are committed by persons under 18 than over 18, the
discrepancy in treatment is much less than might seem.
Granted, however, that a substantial discrepancy exists, that
does not establish the requisite proposition that the death
sentence for offenders under 18 is categorically unacceptable
to prosecutors and juries.   To the contrary, it is not only pos-
sible, but overwhelmingly probable, that the very consider-
ations which induce petitioners and their supporters to be-
lieve that death should *never* be imposed on offenders under
18 cause prosecutors and juries to believe that it should
*rarely* be imposed.

## B

This last point suggests why there is also no relevance to
the laws cited by petitioners and their *amici* which set 18 or
more as the legal age for engaging in various activities, rang-
ing from driving to drinking alcoholic beverages to voting.
It is, to begin with, absurd to think that one must be mature
enough to drive carefully, to drink responsibly, or to vote
intelligently, in order to be mature enough to understand
that murdering another human being is profoundly wrong,
and to conform one's conduct to that most minimal of all civi-
lized standards.   But even if the requisite degrees of matu-
rity were comparable, the age statutes in question would still
not be relevant.   They do not represent a social judgment
that all persons under the designated ages are not responsi-
ble enough to drive, to drink, or to vote, but at most a judg-
ment that the vast majority are not.   These laws set the ap-
propriate ages for the operation of a system that makes its
determinations in gross, and that does not conduct individual-
ized maturity tests for each driver, drinker, or voter.   The

criminal justice system, however, does provide individualized testing. In the realm of capital punishment in particular, "individualized consideration [is] a constitutional requirement," *Lockett* v. *Ohio*, 438 U. S. 586, 605 (1978) (opinion of Burger, C. J.) (footnote omitted); see also *Zant* v. *Stephens*, 462 U. S. 862, 879 (1983) (collecting cases), and one of the individualized mitigating factors that sentencers must be permitted to consider is the defendant's age, see *Eddings* v. *Oklahoma*, 455 U. S. 104, 115–116 (1982). Twenty-nine States, including both Kentucky and Missouri, have codified this constitutional requirement in laws specifically designating the defendant's age as a mitigating factor in capital cases.[5] Moreover, the determinations required by juvenile transfer statutes to certify a juvenile for trial as an adult ensure individualized consideration of the maturity and moral responsibility of 16- and 17-year-old offenders before they are even held to stand trial as adults.[6] The application of this

---

[5] See Ala. Code § 13A–5–51(7) (1982); Ariz. Rev. Stat. Ann. § 13–703(G)(5) (Supp. 1988); Ark. Code Ann. § 5–4–605(4) (1987); Cal. Penal Code Ann. § 190.3(i) (West 1988); Colo. Rev. Stat. § 16–11–103(5)(a) (1986); Conn. Gen. Stat. § 53a–46a(g)(1) (1989); Fla. Stat. § 921.141(6)(g) (1987); Ind. Code § 35–50–2–9(c)(7) (1988); Ky. Rev. Stat. Ann. § 532.025(2)(b)(8) (Baldwin 1988); La. Code Crim. Proc. Ann., Art. 905.5(f) (West 1984); Md. Ann. Code, Art. 27, § 413(g)(5) (1988); Miss. Code Ann. § 99–19–101(6)(g) (Supp. 1988); Mo. Rev. Stat. § 565.032(3)(7) (1986); Mont. Code Ann. § 46–18–304(7) (1987); Neb. Rev. Stat. § 29–2523(2)(d) (1985); Nev. Rev. Stat. § 200.035(6) (1987); N. H. Rev. Stat. Ann. § 630:5(II)(b)(5) (1986); N. J. Stat. Ann. § 2C:11–3(c)(5)(c) (West Supp. 1988); N. M. Stat. Ann. § 31–20A–6(I) (1987); N. C. Gen. Stat. § 15A–2000(f)(7) (1988); Ohio Rev. Code Ann. § 2929.04(B)(4) (1987); Ore. Rev. Stat. § 163.150(1)(b)(B) (1987); 42 Pa. Cons. Stat. § 9711(e)(4) (1982); S. C. Code § 16–3–20(C)(b)(9) (Supp. 1988); Tenn. Code Ann. § 39–2–203(j)(7) (1982); Utah Code Ann. § 76–3–207 (2)(e) (Supp. 1988); Va. Code § 19.2–264.4(B)(v) (1983); Wash. Rev. Code § 10.95.070(7) (Supp. 1989); Wyo. Stat. § 6–2–102(j)(vii) (1988).

[6] The Kentucky statute under which Stanford was certified to be tried as an adult provides in relevant part:

"(3) If the court determines that probable cause exists [to believe that a person 16 years old or older committed a felony or that a person under 16 years of age committed a Class A felony or a capital offense], it shall then

particularized system to the petitioners can be declared constitutionally inadequate only if there is a consensus, not that 17 or 18 is the age at which most persons, or even almost all persons, achieve sufficient maturity to be held fully responsible for murder; but that 17 or 18 is the age before which *no one* can reasonably be held fully responsible. What displays society's views on this latter point are not the ages set forth in the generalized system of driving, drinking, and voting laws cited by petitioners and their *amici*, but the ages at

---

determine if it is in the best interest of the child and the community to order such a transfer based upon the seriousness of the alleged offense; whether the offense was against person or property, with greater weight being given to offenses against persons; the maturity of the child as determined by his environment; the child's prior record; and the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services, and facilities currently available to the juvenile justice system." Ky. Rev. Stat. Ann. § 208.170 (Michie 1982) (repealed effective July 15, 1984).

The Missouri statute under which Wilkins was certified provides that in determining whether to transfer a juvenile the court must consider:

"(1) The seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;

"(2) Whether the offense alleged involved viciousness, force and violence;

"(3) Whether the offense alleged was against persons or property with greater weight being given to the offense against persons, especially if personal injury resulted;

"(4) Whether the offense alleged is a part of a repetitive pattern of offenses which indicates that the child may be beyond rehabilitation under the juvenile code;

"(5) The record and history of the child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions and other placements;

"(6) The sophistication and maturity of the child as determined by consideration of his home and environmental situation, emotional condition and pattern of living;

"(7) The program and facilities available to the juvenile court in considering disposition; and

"(8) Whether or not the child can benefit from the treatment or rehabilitative programs available to the juvenile court." Mo. Rev. Stat. § 211.071(6) (1986).

which the States permit their particularized capital punishment systems to be applied.[7]

## V

Having failed to establish a consensus against capital punishment for 16- and 17-year-old offenders through state and federal statutes and the behavior of prosecutors and juries, petitioners seek to demonstrate it through other indicia, including public opinion polls, the views of interest groups, and the positions adopted by various professional associations. We decline the invitation to rest constitutional law upon such uncertain foundations. A revised national consensus so broad, so clear, and so enduring as to justify a permanent prohibition upon all units of democratic government must appear in the operative acts (laws and the application of laws) that the people have approved.

We also reject petitioners' argument that we should invalidate capital punishment of 16- and 17-year-old offenders on the ground that it fails to serve the legitimate goals of penology. According to petitioners, it fails to deter because juveniles, possessing less developed cognitive skills than adults, are less likely to fear death; and it fails to exact just retribution because juveniles, being less mature and responsible, are also less morally blameworthy. In support of these claims, petitioners and their supporting *amici* marshal an array of

---

[7]The dissent believes that individualized consideration is no solution, because "the Eighth Amendment requires that a person who lacks that full degree of responsibility for his or her actions associated with adulthood not be sentenced to death," and this absolute cannot be assured if "a juvenile offender's level of responsibility [is] taken into account only along with a host of other factors that the court or jury may decide outweigh that want of responsibility." *Post*, at 397. But it is equally true that individualized consideration will not absolutely assure immunity from the death penalty to the *non*juvenile who happens to be immature. If individualized consideration is constitutionally inadequate, then, the only logical conclusion is that *everyone* is exempt from the death penalty.

socioscientific evidence concerning the psychological and emotional development of 16- and 17-year-olds.

If such evidence could conclusively establish the entire lack of deterrent effect and moral responsibility, resort to the Cruel and Unusual Punishments Clause would be unnecessary; the Equal Protection Clause of the Fourteenth Amendment would invalidate these laws for lack of rational basis. See *Dallas* v. *Stanglin*, 490 U. S. 19 (1989). But as the adjective "socioscientific" suggests (and insofar as evaluation of moral responsibility is concerned perhaps the adjective "ethicoscientific" would be more apt), it is not demonstrable that no 16-year-old is "adequately responsible" or significantly deterred. It is rational, even if mistaken, to think the contrary. The battle must be fought, then, on the field of the Eighth Amendment; and in that struggle socioscientific, ethicoscientific, or even purely scientific evidence is not an available weapon. The punishment is either "cruel *and* unusual" (*i. e.*, society has set its face against it) or it is not. The audience for these arguments, in other words, is not this Court but the citizenry of the United States. It is they, not we, who must be persuaded. For as we stated earlier, our job is to *identify* the "evolving standards of decency"; to determine, not what they *should* be, but what they *are*. We have no power under the Eighth Amendment to substitute our belief in the scientific evidence for the society's apparent skepticism. In short, we emphatically reject petitioner's suggestion that the issues in this case permit us to apply our "own informed judgment," Brief for Petitioner in No. 87–6026, p. 23, regarding the desirability of permitting the death penalty for crimes by 16- and 17-year-olds.

We reject the dissent's contention that our approach, by "largely return[ing] the task of defining the contours of Eighth Amendment protection to political majorities," leaves "'[c]onstitutional doctrine [to] be formulated by the acts of those institutions which the Constitution is supposed to limit,'" *post*, at 391, 392 (citation omitted). When this Court

cast loose from the historical moorings consisting of the original application of the Eighth Amendment, it did not embark rudderless upon a wide-open sea. Rather, it limited the Amendment's extension to those practices contrary to the "evolving *standards* of decency that mark the progress of a maturing *society*." *Trop* v. *Dulles*, 356 U. S., at 101 (plurality opinion) (emphasis added). It has never been thought that this was a shorthand reference to the preferences of a majority of this Court. By reaching a decision supported neither by constitutional text nor by the demonstrable current standards of our citizens, the dissent displays a failure to appreciate that "those institutions which the Constitution is supposed to limit" include the Court itself. To say, as the dissent says, that "'it is for *us* ultimately to judge whether the Eighth Amendment permits imposition of the death penalty,'" *post*, at 391 (emphasis added), quoting *Enmund* v. *Florida*, 458 U. S., at 797—and to mean that as the dissent means it, *i. e.*, that it is for *us* to judge, not on the basis of what we perceive the Eighth Amendment originally prohibited, or on the basis of what we perceive the society through its democratic processes now overwhelmingly disapproves, but on the basis of what we think "proportionate" and "measurably contributory to acceptable goals of punishment"—to say and mean that, is to replace judges of the law with a committee of philosopher-kings.

While the dissent is correct that several of our cases have engaged in so-called "proportionality" analysis, examining whether "there is a disproportion 'between the punishment imposed and the defendant's blameworthiness,'" and whether a punishment makes any "measurable contribution to acceptable goals of punishment," see *post*, at 393, we have never invalidated a punishment on this basis alone. All of our cases condemning a punishment under this mode of analysis also found that the objective indicators of state laws or jury determinations evidenced a societal consensus against that penalty. See *Solem* v. *Helm*, 463 U. S., at 299–300;

*Enmund* v. *Florida, supra*, at 789–796; *Coker* v. *Georgia*, 433 U. S., at 593–597 (plurality opinion). In fact, the two methodologies blend into one another, since "proportionality" analysis itself can only be conducted on the basis of the standards set by our own society; the only alternative, once again, would be our personal preferences.

\*       \*       \*

We discern neither a historical nor a modern societal consensus forbidding the imposition of capital punishment on any person who murders at 16 or 17 years of age. Accordingly, we conclude that such punishment does not offend the Eighth Amendment's prohibition against cruel and unusual punishment.

The judgments of the Supreme Court of Kentucky and the Supreme Court of Missouri are therefore

*Affirmed.*

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

Last Term, in *Thompson* v. *Oklahoma*, 487 U. S. 815, 857–858 (1988) (opinion concurring in judgment), I expressed the view that a criminal defendant who would have been tried as a juvenile under state law, but for the granting of a petition waiving juvenile court jurisdiction, may only be executed for a capital offense if the State's capital punishment statute specifies a minimum age at which the commission of a capital crime can lead to an offender's execution and the defendant had reached that minimum age at the time the crime was committed. As a threshold matter, I indicated that such specificity is not necessary to avoid constitutional problems if it is clear that no national consensus forbids the imposition of capital punishment for crimes committed at such an age. *Id.*, at 857. Applying this two-part standard in *Thompson*, I concluded that Oklahoma's imposition of a death sentence on an individual who was 15 years old at the time he committed a capital offense should be set aside. Applying the same

standard today, I conclude that the death sentences for capital murder imposed by Missouri and Kentucky on petitioners Wilkins and Stanford respectively should not be set aside because it is sufficiently clear that no national consensus forbids the imposition of capital punishment on 16- or 17-year-old capital murderers.

In *Thompson* I noted that "[t]he most salient statistic that bears on this case is that every single American legislature that has expressly set a minimum age for capital punishment has set that age at 16 or above." *Id.*, at 849. It is this difference between *Thompson* and these cases, more than any other, that convinces me there is no national consensus forbidding the imposition of capital punishment for crimes committed at the age of 16 and older. See *ante*, at 370–372. As the Court indicates, "a majority of the States that permit capital punishment authorize it for crimes committed at age 16 or above . . . ." *Ante*, at 371. Three States, including Kentucky, have specifically set the minimum age for capital punishment at 16, see Ind. Code § 35–50–2–3(b) (1988); Ky. Rev. Stat. Ann. § 640.040(1) (Baldwin 1987); Nev. Rev. Stat. § 176.025 (1987), and a fourth, Florida, clearly contemplates the imposition of capital punishment on 16-year-olds in its juvenile transfer statute, see Fla. Stat. § 39.02(5)(c) (1987). Under these circumstances, unlike the "peculiar circumstances" at work in *Thompson*, I do not think it necessary to require a state legislature to specify that the commission of a capital crime can lead to the execution of a 16- or 17-year-old offender. Because it is sufficiently clear that today no national consensus forbids the imposition of capital punishment in these circumstances, "the implicit nature of the [Missouri] Legislature's decision [is] not . . . constitutionally problematic." 487 U. S., at 857. This is true, *a fortiori*, in the case of Kentucky, which has specified 16 as the minimum age for the imposition of the death penalty. The day may come when there is such general legislative rejection of the execution of 16- or 17-year-old capital murderers that a clear na-

tional consensus can be said to have developed. Because I do not believe that day has yet arrived, I concur in Parts I, II, III, and IV–A of the Court's opinion, and I concur in its judgment.

I am unable, however, to join the remainder of the plurality's opinion for reasons I stated in *Thompson*. Part V of the plurality's opinion "emphatically reject[s]," *ante*, at 378, the suggestion that, beyond an assessment of the specific enactments of American legislatures, there remains a constitutional obligation imposed upon this Court to judge whether the "'nexus between the punishment imposed and the defendant's blameworthiness'" is proportional. *Thompson*, *supra*, at 853, quoting *Enmund* v. *Florida*, 458 U. S. 782, 825 (1982) (O'CONNOR, J., dissenting). Part IV–B of the plurality's opinion specifically rejects as irrelevant to Eighth Amendment considerations state statutes that distinguish juveniles from adults for a variety of other purposes. In my view, this Court does have a constitutional obligation to conduct proportionality analysis. See *Penry* v. *Lynaugh*, *ante*, at 335–340; *Tison* v. *Arizona*, 481 U. S. 137, 155–158 (1987); *Enmund*, 458 U. S., at 797–801; *id.*, at 825–826 (O'CONNOR, J., dissenting). In *Thompson* I specifically identified age-based statutory classifications as "relevant to Eighth Amendment proportionality analysis." 487 U. S., at 854 (opinion concurring in judgment). Thus, although I do not believe that these particular cases can be resolved through proportionality analysis, see *Thompson*, *supra*, at 853–854, I reject the suggestion that the use of such analysis is improper as a matter of Eighth Amendment jurisprudence. Accordingly, I join all but Parts IV–B and V of JUSTICE SCALIA's opinion.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

I believe that to take the life of a person as punishment for a crime committed when below the age of 18 is cruel and unusual and hence is prohibited by the Eighth Amendment.

The method by which this Court assesses a claim that a punishment is unconstitutional because it is cruel and unusual is established by our precedents, and it bears little resemblance to the method four Members of the Court apply in this case. To be sure, we *begin* the task of deciding whether a punishment is unconstitutional by reviewing legislative enactments and the work of sentencing juries relating to the punishment in question to determine whether our Nation has set its face against a punishment to an extent that it can be concluded that the punishment offends our "evolving standards of decency." *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion). The Court undertakes such an analysis in this case. *Ante*, at 370–373. But JUSTICE SCALIA, in his plurality opinion on this point, *ante*, at 374–380, would treat the Eighth Amendment inquiry as *complete* with this investigation. I agree with JUSTICE O'CONNOR, *ante*, at 382, that a more searching inquiry is mandated by our precedents interpreting the Cruel and Unusual Punishments Clause. In my view, that inquiry must in these cases go beyond age-based statutory classifications relating to matters other than capital punishment, cf. *ibid.* (O'CONNOR, J., concurring in part and concurring in judgment), and must also encompass what JUSTICE SCALIA calls, with evident but misplaced disdain, "ethicoscientific" evidence. Only then can we be in a position to judge, as our cases require, whether a punishment is unconstitutionally excessive, either because it is disproportionate given the culpability of the offender, or because it serves no legitimate penal goal.

I

Our judgment about the constitutionality of a punishment under the Eighth Amendment is informed, though not determined, see *infra*, at 391, by an examination of contemporary attitudes toward the punishment, as evidenced in the actions of legislatures and of juries. *McCleskey* v. *Kemp*, 481 U. S. 279, 300 (1987); *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977)

(plurality opinion). The views of organizations with expertise in relevant fields and the choices of governments elsewhere in the world also merit our attention as indicators whether a punishment is acceptable in a civilized society.

## A

The Court's discussion of state laws concerning capital sentencing, *ante*, at 370–372, gives a distorted view of the evidence of contemporary standards that these legislative determinations provide. Currently, 12 of the States whose statutes permit capital punishment specifically mandate that offenders under age 18 not be sentenced to death. *Ante*, at 370–371, n. 2. When one adds to these 12 States the 15 (including the District of Columbia) in which capital punishment is not authorized at all,[1] it appears that the governments in fully 27 of the States have concluded that no one under 18 should face the death penalty. A further three States explicitly refuse to authorize sentences of death for those who committed their offense when under 17, *ante*, at 370, n. 2, making a total of 30 States that would not tolerate the execution of petitioner Wilkins. Congress' most recent enactment of a death penalty statute also excludes those under 18.

---

[1] See *Thompson* v. *Oklahoma*, 487 U. S. 815, 826, and n. 25 (1988), listing 14 States. The 15th State to have rejected capital punishment altogether is Vermont. Vermont repealed a statute that had allowed capital punishment for some murders. See Vt. Stat. Ann., Tit. 13, § 2303 (1974 and Supp. 1988). The State now provides for the death penalty only for kidnaping with intent to extort money. § 2403. Insofar as it permits a sentence of death, § 2403 was rendered unconstitutional by our decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972), because Vermont's sentencing scheme does not guide jury discretion, see Vt. Stat. Ann., Tit. 13, §§ 7101–7107 (1974). Vermont's decision not to amend its only law allowing the death penalty in light of *Furman* and its progeny, in combination with its repeal of its statute permitting capital punishment for murder, leads to the conclusion that the State rejects capital punishment.

In addition, South Dakota, though it statutorily provides for a death penalty, has sentenced no one to death since *Furman*, arguably making a 28th State that has abandoned the death penalty.

Pub. L. 100–690, § 7001(l), 102 Stat. 4390, 21 U. S. C. § 848(*l*) (1988 ed.).

In 19 States that have a death penalty, no minimum age for capital sentences is set in the death penalty statute. See *Thompson* v. *Oklahoma,* 487 U. S. 815, 826–827, and n. 26 (1988), and n. 1, *supra.* The notion that these States have consciously authorized the execution of juveniles derives from the congruence in those jurisdictions of laws permitting state courts to hand down death sentences, on the one hand, and, on the other, statutes permitting the transfer of offenders under 18 from the juvenile to state court systems for trial in certain circumstances. See *Thompson, supra,* at 867–868, and n. 3 (SCALIA, J., dissenting). I would not assume, however, in considering how the States stand on the moral issue that underlies the constitutional question with which we are presented, that a legislature that has never specifically considered the issue has made a conscious moral choice to permit the execution of juveniles. See 487 U. S., at 826–827, n. 24 (plurality opinion). On a matter of such moment that most States have expressed an explicit and contrary judgment, the decisions of legislatures that are only implicit, and that lack the "earmarks of careful consideration that we have required for other kinds of decisions leading to the death penalty," *id.,* at 857 (O'CONNOR, J., concurring in judgment), must count for little. I do not suggest, of course, that laws of these States cut *against* the constitutionality of the juvenile death penalty—only that accuracy demands that the baseline for our deliberations should be that 27 States refuse to authorize a sentence of death in the circumstances of petitioner Stanford's case, and 30 would not permit Wilkins' execution; that 19 States have not squarely faced the question; and that only the few remaining jurisdictions have explicitly set an age below 18 at which a person may be sentenced to death.

B

The application of these laws is another indicator the Court agrees to be relevant. The fact that juries have on occasion

sentenced a minor to death shows, the Court says, that the death penalty for adolescents is not categorically unacceptable to juries. *Ante,* at 374. This, of course, is true; but it is not a conclusion that takes Eighth Amendment analysis very far. Just as we have never insisted that a punishment have been rejected unanimously by the States before we may judge it cruel and unusual, so we have never adopted the extraordinary view that a punishment is beyond Eighth Amendment challenge if it is sometimes handed down by a jury. See, *e. g., Enmund* v. *Florida,* 458 U. S. 782, 792 (1982) (holding the death penalty cruel and unusual punishment for participation in a felony in which an accomplice commits murder, though about a third of American jurisdictions authorized such punishment, and at least six non-triggerman felony murderers had been executed, and three others were on death rows); *Coker* v. *Georgia,* 433 U. S., at 596–597 (holding capital punishment unconstitutional for the rape of an adult woman, though 72 persons had been executed for rape in this country since 1955, see *Enmund, supra,* at 795, and though Georgia juries handed down six death sentences for rape between 1973 and 1977). *Enmund* and *Coker* amply demonstrate that it is no "requisite" of finding an Eighth Amendment violation that the punishment in issue be "categorically unacceptable to prosecutors and juries," *ante,* at 374—and, evidently, resort to the Cruel and Unusual Punishments Clause would not be necessary to test a sentence never imposed because categorically unacceptable to juries.

Both in absolute and in relative terms, imposition of the death penalty on adolescents is distinctly unusual. Adolescent offenders make up only a small proportion of the current death-row population: 30 out of a total of 2,186 inmates, or 1.37 percent. NAACP Legal Defense and Educational Fund, Inc. (LDF), Death Row, U. S. A. (Mar. 1, 1989).[2]

---

[2] One person currently on death row for juvenile crimes was sentenced in Maryland, which has since set 18 as the minimum age for its death penalty.

Eleven minors were sentenced to die in 1982; nine in 1983; six in 1984; five in 1985; seven in 1986; and two in 1987. App. N to Brief for the Office of the Capital Collateral Representative for the State of Florida as *Amicus Curiae* (hereafter OCCR Brief). Forty-one, or 2.3 percent, of the 1,813 death sentences imposed between January 1, 1982, and June 30, 1988, were for juvenile crimes. *Id.*, at 15, and App. R. And juvenile offenders are significantly less likely to receive the death penalty than adults. During the same period, there were 97,086 arrests of adults for homicide, and 1,772 adult death sentences, or 1.8 percent; and 8,911 arrests of minors for homicide, compared to 41 juvenile death sentences, or 0.5 percent. *Ibid.*, and Apps. Q and R.[3]

The Court speculates that this very small number of capital sentences imposed on adolescents indicates that juries have considered the youth of the offender when determining sentence, and have reserved the punishment for rare cases in which it is nevertheless appropriate. *Ante*, at 374. The State of Georgia made a very similar and equally conjectural argument in *Coker*—that "as a practical matter juries simply reserve the extreme sanction for extreme cases of rape, and that recent experience . . . does not prove that jurors consider the death penalty to be a disproportionate punishment for every conceivable instance of rape." 433 U. S., at 597. This Court, however, summarily rejected this claim, noting simply that in the vast majority of cases, Georgia juries had not imposed the death sentence for rape. It is certainly true that in the vast majority of cases, juries have not sentenced juveniles to death, and it seems to me perfectly proper to conclude that a sentence so rarely imposed is "unusual."

---

[3] Capital sentences for juveniles would presumably be more unusual still were capital juries drawn from a cross section of our society, rather than excluding many who oppose capital punishment, see *Lockhart* v. *McCree*, 476 U. S. 162 (1986)—a fact that renders capital jury sentences a distinctly weighted measure of contemporary standards.

## C

Further indicators of contemporary standards of decency that should inform our consideration of the Eighth Amendment question are the opinions of respected organizations. *Thompson*, 487 U. S., at 830 (plurality opinion). Where organizations with expertise in a relevant area have given careful consideration to the question of a punishment's appropriateness, there is no reason why that judgment should not be entitled to attention as an indicator of contemporary standards. There is no dearth of opinion from such groups that the state-sanctioned killing of minors is unjustified. A number, indeed, have filed briefs *amicus curiae* in these cases, in support of petitioners.[4] The American Bar Association has adopted a resolution opposing the imposition of capital punishment upon any person for an offense committed while under age 18,[5] as has the National Council of Juvenile

---

[4] Briefs for American Bar Association; Child Welfare League of America, National Parents and Teachers Association, National Council on Crime and Delinquency, Children's Defense Fund, National Association of Social Workers, National Black Child Development Institute, National Network of Runaway and Youth Services, National Youth Advocate Program, and American Youth Work Center; American Society for Adolescent Psychiatry and American Orthopsychiatric Association; Defense for Children International–USA; National Legal Aid and Defender Association, and National Association of Criminal Defense Lawyers; Office of Capital Collateral Representative for the State of Florida; and International Human Rights Law Group, as *Amici Curiae*. See also Briefs for American Baptist Churches, American Friends Service Committee, American Jewish Committee, American Jewish Congress, Christian Church (Disciples of Christ), Mennonite Central Committee, General Conference Mennonite Church, National Council of Churches, General Assembly of the Presbyterian Church, Southern Christian Leadership Conference, Union of American Hebrew Congregations, United Church of Christ Commission for Racial Justice, United Methodist Church General Board of Church and Society, and United States Catholic Conference; West Virginia Council of Churches; and Amnesty International as *Amici Curiae*.

[5] American Bar Association, Summary of Action of the House of Delegates 17 (1983 Annual Meeting).

and Family Court Judges.[6] The American Law Institute's Model Penal Code similarly includes a lower age limit of 18 for the death sentence.[7] And the National Commission on Reform of the Federal Criminal Laws also recommended that 18 be the minimum age.[8]

Our cases recognize that objective indicators of contemporary standards of decency in the form of legislation in other countries is also of relevance to Eighth Amendment analysis. *Thompson, supra,* at 830–831; *Enmund,* 458 U. S., at 796, n. 22; *Coker, supra,* at 596, n. 10; *Trop* v. *Dulles,* 356 U. S., at 102, and n. 35. Many countries, of course—over 50, including nearly all in Western Europe—have formally abolished the death penalty, or have limited its use to exceptional crimes such as treason. App. to Brief for Amnesty International as *Amicus Curiae.* Twenty-seven others do not in practice impose the penalty. *Ibid.* Of the nations that retain capital punishment, a majority—65—prohibit the execution of juveniles. *Ibid.* Sixty-one countries retain capital punishment and have no statutory provision exempting juveniles, though some of these nations are ratifiers of international treaties that do prohibit the execution of juveniles. *Ibid.* Since 1979, Amnesty International has recorded only eight executions of offenders under 18 throughout the world, three of these in the United States. The other five executions were carried out in Pakistan, Bangladesh, Rwanda, and Barbados.[9] In addition to national laws, three leading human rights treaties ratified or signed by the United States

[6] National Council of Juvenile and Family Court Judges, Juvenile and Family Court Newsletter, Vol. 19, No. 1, p. 4 (Oct. 1988).

[7] American Law Institute, Model Penal Code § 210.6(1)(d) (Proposed Official Draft 1962); American Law Institute, Model Penal Code and Commentaries § 210.6, Commentary, p. 133 (1980) ("[C]ivilized societies will not tolerate the spectacle of execution of children").

[8] National Commission on Reform of Federal Criminal Laws, Final Report of the Proposed New Federal Criminal Code § 3603 (1971).

[9] Brief for Amnesty International as *Amicus Curiae* in *Thompson* v. *Oklahoma,* O. T. 1987, No. 86–6169, p. 6.

explicitly prohibit juvenile death penalties.[10]    Within the world community, the imposition of the death penalty for juvenile crimes appears to be overwhelmingly disapproved.

## D

Together, the rejection of the death penalty for juveniles by a majority of the States, the rarity of the sentence for juveniles, both as an absolute and a comparative matter, the decisions of respected organizations in relevant fields that this punishment is unacceptable, and its rejection generally throughout the world, provide to my mind a strong grounding for the view that it is not constitutionally tolerable that certain States persist in authorizing the execution of adolescent offenders.    It is unnecessary, however, to rest a view that the Eighth Amendment prohibits the execution of minors solely upon a judgment as to the meaning to be attached to the evidence of contemporary values outlined above, for the execution of juveniles fails to satisfy two well-established and independent Eighth Amendment requirements — that a

---

[10] Article 6(5) of the International Covenant on Civil and Political Rights, Annex to G. A. Res. 2200, 21 U. N. GAOR Res. Supp. (No. 16) 53, U. N. Doc. A/6316 (1966) (signed but not ratified by the United States), reprinted in 6 International Legal Material 368, 370 (1967); Article 4(5) of the American Convention on Human Rights, O. A. S. Official Records, OEA/Ser. K/XVI/1.1, Doc. 65, Rev. 1, Corr. 2 (1970) (same), reprinted in 9 International Legal Material 673, 676 (1970); Article 68 of the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, August 12, 1949, 6 U. S. T. 3516, T. I. A. S. No. 3365 (ratified by the United States). See also Resolutions and Decisions of the United Nations Economic and Social Council, Res. 1984/50, U. N. ESCOR Supp. (No. 1), p. 33, U. N. Doc. E/1984/84 (1984) (adopting "safeguards guaranteeing protection of the rights of those facing the death penalty," including the safeguard that "[p]ersons below 18 years of age at the time of the commission of the crime shall not be sentenced to death"), endorsed by the United Nations General Assembly, U. N. GAOR Res. 39/118, U. N. Doc. A/39/51, p. 211, ¶¶ 2, 5 (1985), and adopted by the Seventh United Nations Congress on the Prevention of Crime and the Treatment of Offenders, p. 83, U. N. Doc. A/Conf. 121/22, U. N. Sales No. E.86.IV.1 (1986).

punishment not be disproportionate, and that it make a contribution to acceptable goals of punishment.

## II

JUSTICE SCALIA forthrightly states in his plurality opinion that Eighth Amendment analysis is at an end once legislation and jury verdicts relating to the punishment in question are analyzed as indicators of contemporary values. A majority of the Court rejected this revisionist view as recently as last Term, see *Thompson*, 487 U. S., at 833–838 (plurality opinion); *id.*, at 853–854 (opinion of O'CONNOR, J.), and does so again in this case and in *Penry* v. *Lynaugh, ante,* p. 302. We need not and should not treat this narrow range of factors as determinative of our decision whether a punishment violates the Constitution because it is excessive.

The Court has explicitly stated that "the attitude of state legislatures and sentencing juries do *not* wholly determine" a controversy arising under the Eighth Amendment, *Coker,* 433 U. S., at 597 (plurality opinion) (emphasis added), because "the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the [constitutional] acceptability of" a punishment, *ibid.* See also *id.*, at 603–604, n. 2 (Powell, J., concurring in judgment) ("[T]he ultimate decision as to the appropriateness of the death penalty under the Eighth Amendment . . . must be decided on the basis of our own judgment in light of the precedents of this Court"); *Enmund, supra,* at 797 ("Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty" in a particular class of cases).

JUSTICE SCALIA's approach would largely return the task of defining the contours of Eighth Amendment protection to political majorities. But

> "[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and

> officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624, 638 (1943).

Compare *ante*, at 375–377, with *Whitley* v. *Albers*, 475 U. S. 312, 318 (1986) ("The language of the Eighth Amendment . . . manifests 'an intention to limit the power of those entrusted with the criminal-law function of government'"). The promise of the Bill of Rights goes unfulfilled when we leave "[c]onstitutional doctrine [to] be formulated by the acts of those institutions which the Constitution is supposed to limit," Radin, The Jurisprudence of Death, 126 U. Pa. L. Rev. 989, 1036 (1978), as is the case under JUSTICE SCALIA's positivist approach to the definition of citizens' rights. This Court abandons its proven and proper role in our constitutional system when it hands back to the very majorities the Framers distrusted the power to define the precise scope of protection afforded by the Bill of Rights, rather than bringing its own judgment to bear on that question, after complete analysis. Despite JUSTICE SCALIA's view to the contrary, however,

> "our cases . . . make clear that public perceptions of standards of decency with respect to criminal sanctions are not conclusive. A penalty also must accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.' . . . This means, at least, that the punishment not be 'excessive.' . . . [T]he inquiry into 'excessiveness' has two aspects. First, the punishment must not involve the unnecessary and wanton infliction of pain. . . . Second, the punishment must not be grossly out of proportion to the severity of the crime." *Gregg* v. *Georgia*, 428 U. S. 153, 173 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.).

Thus, in addition to asking whether legislative or jury rejection of a penalty shows that "society has set its face against it," *ante,* at 378, the Court asks whether "a punishment is 'excessive' and unconstitutional" because there is disproportion "between the punishment imposed and the defendant's blameworthiness," *ante,* at 382 (opinion of O'CONNOR, J.), or because it "makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering," *Coker, supra,* at 592 (plurality opinion). See, *e. g., Penry, ante,* at 335 (opinion of O'CONNOR, J.); *ante,* at 342–343 (BRENNAN, J., concurring in part and dissenting in part).

## III

There can be no doubt at this point in our constitutional history that the Eighth Amendment forbids punishment that is wholly disproportionate to the blameworthiness of the offender. "The constitutional principle of proportionality has been recognized explicitly in this Court for almost a century." *Solem* v. *Helm,* 463 U. S. 277, 286 (1983). Usually formulated as a requirement that sentences not be "disproportionate to the crime committed," *id.,* at 284; see, *e. g., Weems* v. *United States,* 217 U. S. 349 (1910); *O'Neil* v. *Vermont,* 144 U. S. 323, 339–340 (1892) (Field, J., dissenting), the proportionality principle takes account not only of the "injury to the person and to the public" caused by a crime, but also of the "moral depravity" of the offender. *Coker, supra,* at 598. The offender's culpability for his criminal acts—"the degree of the defendant's blameworthiness," *Enmund,* 458 U. S., at 815 (O'CONNOR, J., dissenting); see also *id.,* at 798 (opinion of the Court)—is thus of central importance to the constitutionality of the sentence imposed. Indeed, this focus on a defendant's blameworthiness runs throughout our constitutional jurisprudence relating to capital sentencing. See, *e. g., Booth* v. *Maryland,* 482 U. S. 496, 502 (1987) (striking down state statute requiring consideration by sentencer of evidence other than defendant's record and characteristics and the cir-

cumstances of the crime, which had no "bearing on the defendant's 'personal responsibility and moral guilt'"); *California* v. *Brown*, 479 U. S. 538, 545 (1987) (an "emphasis on culpability in sentencing decisions has long been reflected in Anglo-American jurisprudence. . . . *Lockett* and *Eddings* reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant") (O'CONNOR, J., concurring).

Proportionality analysis requires that we compare "the gravity of the offense," understood to include not only the injury caused, but also the defendant's culpability, with "the harshness of the penalty." *Solem, supra*, at 292. In my view, juveniles so generally lack the degree of responsibility for their crimes that is a predicate for the constitutional imposition of the death penalty that the Eighth Amendment forbids that they receive that punishment.

## A

Legislative determinations distinguishing juveniles from adults abound. These age-based classifications reveal much about how our society regards juveniles as a class, and about societal beliefs regarding adolescent levels of responsibility. See *Thompson*, 487 U. S., at 823–825 (plurality opinion).

The participation of juveniles in a substantial number of activities open to adults is either barred completely or significantly restricted by legislation. All States but two have a uniform age of majority, and have set that age at 18 or above. OCCR Brief, App. A. No State has lowered its voting age below 18. *Id.*, App. C; see *Thompson, supra*, at 839, App. A. Nor does any State permit a person under 18 to serve on a jury. OCCR Brief, App. B; see *Thompson, supra*, at 840, App. B. Only four States ever permit persons below 18 to marry without parental consent. OCCR Brief, App. D; see *Thompson, supra*, at 843, App. D. Thirty-seven States have specific enactments requiring that a patient have attained 18 before she may validly consent to medical treatment. OCCR Brief, App. E. Thirty-four

States require parental consent before a person below 18 may drive a motor car. *Id.*, App. F; see *Thompson, supra,* at 842, App. C. Legislation in 42 States prohibits those under 18 from purchasing pornographic materials. OCCR Brief, App. G; see *Thompson, supra,* at 845, App. E. Where gambling is legal, adolescents under 18 are generally not permitted to participate in it, in some or all of its forms. OCCR Brief, App. H; see *Thompson, supra,* at 847, App. F. In these and a host of other ways, minors are treated differently from adults in our laws, which reflects the simple truth derived from communal experience that juveniles as a class have not the level of maturation and responsibility that we presume in adults and consider desirable for full participation in the rights and duties of modern life.

"The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult." *Thompson, supra,* at 835 (plurality opinion). Adolescents "are more vulnerable, more impulsive, and less self-disciplined than adults," and are without the same "capacity to control their conduct and to think in long-range terms." Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders, Confronting Youth Crime 7 (1978) (hereafter Task Force). They are particularly impressionable and subject to peer pressure, see *Eddings* v. *Oklahoma,* 455 U. S. 104, 115 (1982), and prone to "experiment, risk-taking and bravado," Task Force 3. They lack "experience, perspective, and judgment." *Bellotti* v. *Baird,* 443 U. S. 622, 635 (1979). See generally *Thompson, supra,* at 43–44, n. 43; Brief for American Society for Adolescent Psychiatry et al. as *Amici Curiae* (reviewing scientific evidence). Moreover, the very paternalism that our society shows toward youths and the dependency it forces upon them mean that society bears a responsibility for the actions of juveniles that it does not for the actions of adults who are at least theoretically free to make their own choices: "youth crime . . . is not exclusively the offender's fault; offenses by

the young represent a failure of family, school, and the social system, which share responsibility for the development of America's youth." Task Force 7.

To be sure, the development of cognitive and reasoning abilities and of empathy, the acquisition of experience upon which these abilities operate and upon which the capacity to make sound value judgments depends, and in general the process of maturation into a self-directed individual fully responsible for his or her actions, occur by degrees. See, *e. g.*, G. Manaster, Adolescent Development and the Life Tasks (1977). But the factors discussed above indicate that 18 is the dividing line that society has generally drawn, the point at which it is thought reasonable to assume that persons have an ability to make, and a duty to bear responsibility for their, judgments. Insofar as age 18 is a necessarily arbitrary social choice as a point at which to acknowledge a person's maturity and responsibility, given the different developmental rates of individuals, it is in fact "a conservative estimate of the dividing line between adolescence and adulthood. Many of the psychological and emotional changes that an adolescent experiences in maturing do not actually occur until the early 20s." Brief for American Society for Adolescent Psychiatry et al. as *Amici Curiae* 4 (citing social scientific studies).

B

There may be exceptional individuals who mature more quickly than their peers, and who might be considered fully responsible for their actions prior to the age of 18, despite their lack of the experience upon which judgment depends.[11] In my view, however, it is not sufficient to accommodate the

---

[11] Delinquent juveniles are unlikely to be among these few. Instead, they will typically be among those persons for whom society's presumption of a capacity for mature judgment at 18 is much too generous. See, *e. g.*, Scharf, Law and the Child's Evolving Legal Conscience, in 1 Advances in Law and Child Development 1, 16 (R. Sprague ed. 1982) (discussing study of delinquents aged 15 to 17, suggesting that the group's mean moral maturity level was below that of average middle-class 10- to 12-year-olds).

facts about juveniles that an individual youth's culpability may be taken into account in the decision to transfer him or her from the juvenile to the adult court system for trial, or that a capital sentencing jury is instructed to consider youth and other mitigating factors. I believe that the Eighth Amendment requires that a person who lacks that full degree of responsibility for his or her actions associated with adult-hood not be sentenced to death. Hence it is constitutionally inadequate that a juvenile offender's level of responsibility be taken into account only along with a host of other factors that the court or jury may decide outweigh that want of responsibility.

Immaturity that constitutionally should operate as a bar to a disproportionate death sentence does *not* guarantee that a minor will not be transferred for trial to the adult court system. Rather, the most important considerations in the decision to transfer a juvenile offender are the seriousness of the offense, the extent of prior delinquency, and the response to prior treatment within the juvenile justice system. National Institute for Juvenile Justice and Delinquency, United States Dept. of Justice, Major Issues in Juvenile Justice Information and Training, Youth in Adult Courts: Between Two Worlds 211 (1982). Psychological, intellectual, and other personal characteristics of juvenile offenders receive little attention at the transfer stage, and cannot account for differences between those transferred and those who remain in the juvenile court system. See Solway, Hays, Schreiner, & Cansler, Clinical Study of Youths Petitioned for Certification as Adults, 46 Psychological Rep. 1067 (1980). Nor is an adolescent's lack of full culpability isolated at the sentencing stage as a factor that determinatively bars a death sentence. A jury is free to weigh a juvenile offender's youth and lack of full responsibility against the heinousness of the crime and other aggravating factors—and, finding the aggravating factors weightier, to sentence even the most immature of 16- or 17-year olds to be killed. By no stretch of the imagination,

then, are the transfer and sentencing decisions designed to isolate those juvenile offenders who are exceptionally mature and responsible, and who thus stand out from their peers as a class.

It is thus unsurprising that individualized consideration at transfer and sentencing has not in fact ensured that juvenile offenders lacking an adult's culpability are not sentenced to die. Quite the contrary. Adolescents on death row appear typically to have a battery of psychological, emotional, and other problems going to their likely capacity for judgment and level of blameworthiness. A recent diagnostic evaluation of all 14 juveniles on death rows in four States is instructive. Lewis et al., Neuropsychiatric, Psychoeducational, and Family Characteristics of 14 Juveniles Condemned to Death in the United States, 145 Am. J. Psychiatry 584 (1988). Seven of the adolescents sentenced to die were psychotic when evaluated, or had been so diagnosed in earlier childhood; four others had histories consistent with diagnoses of severe mood disorders; and the remaining three experienced periodic paranoid episodes, during which they would assault perceived enemies. Id., at 585, and Table 3. Eight had suffered severe head injuries during childhood, id., at 585, and Table 1, and nine suffered from neurological abnormalities, id., at 585, and Table 2. Psychoeducational testing showed that only 2 of these death-row inmates had IQ scores above 90 (that is, in the normal range)—and both individuals suffered from psychiatric disorders—while 10 offenders showed impaired abstract reasoning on at least some tests. Id., at 585–586, and Tables 3 and 4. All but two of the adolescents had been physically abused, and five sexually abused. Id., at 586–587, and Table 5. Within the families of these children, violence, alcoholism, drug abuse, and psychiatric disorders were commonplace. Id., at 587, and Table 5.

The cases under consideration today certainly do not suggest that individualized consideration at transfer and sen-

tencing ensure that only exceptionally mature juveniles, as blameworthy for their crimes as an adult, are sentenced to death. Transferring jurisdiction over Kevin Stanford to Circuit Court, the Juvenile Division of the Jefferson, Kentucky, District Court nevertheless found that Stanford, who was 17 at the time of his crime,

> "has a low internalization of the values and morals of society and lacks social skills. That he does possess an institutionalized personality and has, in effect, because of his chaotic family life and lack of treatment, become socialized in delinquent behavior. That he is emotionally immature and could be amenable to treatment if properly done on a long term basis of psychotherap[eu]tic intervention and reality based therapy for socialization and drug therapy in a residential facility." App. in No. 87–5765, p. 9.

At the penalty phase of Stanford's trial, witnesses testified that Stanford, who lived with various relatives, had used drugs from the age of about 13, and that his drug use had caused changes in his personality and behavior. 10 Record in No. 87–5765, pp. 1383–1392, 1432. Stanford had been placed at times in juvenile treatment facilities, and a witness who had assessed him upon his admission to an employment skills project found that he lacked age-appropriate social interaction skills; had a history of drug abuse; and wanted for family support or supervision. *Id.*, at 1408; see also *id.*, at 1440–1442.

Heath Wilkins was 16 when he committed the crime for which Missouri intends to kill him. The juvenile court, in ordering him transferred for trial to adult court, focused upon the viciousness of Wilkins' crime, the juvenile system's inability to rehabilitate him in the 17 months of juvenile confinement available, and the need to protect the public, though it also mentioned that Wilkins was, in its view, "an experienced person, and mature in his appearance and habits." App. in No. 87–6026, p. 5. The Circuit Court found Wilkins

competent to stand trial.[12]  Record in No. 87–6026, p. 42.
Wilkins then waived counsel, with the avowed intention of
pleading guilty and seeking the death penalty, *id.*, at 42, 55,
and the Circuit Court accepted the waiver, *id.*, at 84, and
later Wilkins' guilty plea, *id.*, at 144–145.  Wilkins was not
represented by counsel at sentencing.  See *id.*, at 188–190.
Presenting no mitigating evidence, he told the court he would
prefer the death penalty to life in prison, *id.*, at 186–187—
"[o]ne I fear, the other one I don't," *id.*, at 295—and after
hearing evidence from the State, the Court sentenced Wil-
kins to die.  Wilkins took no steps to appeal and objected
to an *amicus'* efforts on his behalf.  The Missouri Supreme
Court, however, ordered an evaluation to determine whether
Wilkins was competent to waive his right to appellate coun-
sel.  Concluding that Wilkins was incompetent to waive his
rights,[13] the state-appointed forensic psychiatrist found that

---

[12] Two psychological reports were prepared concerning Wilkins when
the issue of his competency to stand trial arose.  Neither suggests that
Wilkins was exceptionally mature for his age.  One found his intellectual
functioning "within the average range," App. in No. 87–6026, p. 10, and
his "[h]igher order processes," such as reasoning and judgment, to be
"within the approximate normal range," *id.*, at 11.  The other concluded:

"[Wilkins'] capacity to manage and control affect is tenuous and incon-
sistent, leaving him a subject to impulsive actions as well as arbitrary and
capricious thinking which is prone to skirt over details, and considera-
tions for logical systematic thought.  He is intolerant of intense affects
such as anxiety, depression, or anger, in that such feelings are overwhelm-
ing, interfere with his ability to think clearly, and gives rise to impulsive
action.  He is vulnerable to massive infusions of intense rage which leads
to spasms of destructive action.  His rage co-mingles with a profound de-
pressive experience generated by an excruciating sense of lonely alienation
whereby he experiences both himself and other people as being lifeless and
empty. . . .

"He barely experiences ties to others or emp[athe]tic attunement . . . ."
*Id.*, at 22.

[13] Wilkins was diagnosed as being of a "Conduct Disorder, Under-
socialized-Aggressive Type," with a borderline personality disorder that
left him with "difficulty in establishing a pattern of predictable response to
stressful situations vacillating between aggression towards others or self-

Wilkins "suffers from a mental disorder" that affects his "reasoning and impairs his behavior." App. in No. 87–6026, p. 74. It would be incredible to suppose, given this psychiatrist's conclusion and his summary of Wilkins' past, set out in the margin,[14] that Missouri's transfer and sentencing schemes

destructive activity." *Id.*, at 67–68. He had been "exhibiting bizarre behavior, paranoid ideation, and idiosyncratic thinking" since 1982. *Id.*, at 68.

[14] The state-appointed psychiatrist summarized Wilkins' past in his report:

"Mr. Wilkins . . . was raised in a rather poor socioeconomic environment [and] reportedly had extremely chaotic upbringing during his childhood. He was physically abused by his mother, sometimes the beatings would last for two hours. . . . As a child, he started robbing houses for knives and money and loved to set fires. Mr. Wilkins' mother worked at night and slept during the day, thus the children were left alone at night by themselves. He claims that he was started on drugs by his uncle [at age six; see *id.*, at 67]. Apparently he used to shoot BB guns at passing cars. Mr. Wilkins indicated that his mother's boyfriend had a quick temper and that he hated him. He also started disliking his mother, not only because she punished [him], but also because she stood up for her boyfriend who was unkind towards [him]. He then decided to poison his mother and boyfriend by placing rat poison in Tylenol capsules. They were informed by his brother about the situation. They secretly emptied the capsules and made him eat them. He was afraid of death and attempted vomiting by placing [his] fingers in his throat. Then he ended up getting a beating from his mother and boyfriend. At the age of ten, Mr. Wilkins was evaluated at Tri-County Mental Health Center and Western Missouri Mental Health Center. He stayed there for a period of six months. He was then sent to Butterfield Youth's Home and then to East Range, a residential facility for boys. He started using drugs quite heavily. . . . He also started drinking hard liquor . . . .

"At Butterfield, he was very angry at the teachers because they considered him to be 'dumb.' He showed rather strange behavior there. When he became depressed he would dance with a net over his head. On another occasion he cut his wrist and claimed to have had frequent thoughts of suicide. Prior to going to Butterfield, he had jumped off a bridge but the car swerved before he was hit. At Butterfield, he attempted to overdose with alcohol and drugs and another time with antipsychotic medication, Mellaril. Mr. Wilkins was placed on Mellaril because he was 'too active.' He stayed at . . . Butterfield . . . for three and one half years

had operated to identify in Wilkins a 16-year old mature and culpable beyond his years.

## C

Juveniles very generally lack that degree of blameworthiness that is, in my view, a constitutional prerequisite for the

between the ages of 10 through 13½. After that, he was transferred to Crittenton Center since it was closer to his mother's residence. He stayed there only for four or five months and was then kicked out. The court gave him permission to go home on probation. At this time his mother had started seeing another boyfriend and Mr. Wilkins apparently liked him. He continued the usage of alcohol and drugs while at school, continued to break into houses stealing money, jewelry, and knives, and generally stole money to spend at the arcade. On one occasion he ran away to Southern California. He was introduced to amphetamines there and spent all his money. . . . After his return [home, he] was charged with a stolen knife and was sent to [a] Detention Center . . . . At age 15, he was sent to the Northwest Regional Youth Services in Kansas City. There, an attempt at prescribing Thorazine (major tranquilizer) was made. After this, Mr. Wilkins was placed in a foster home. He ran away from the foster home . . . . Beginning in May of 1985 he lived on the streets . . . .

"Records from Butterfield . . . indicated that Mr. Wilkins' natural father was committed to a mental institution in Arkansas, and there was considerable amount of physical abuse that existed in the family. . . . In the educational testing, he gave rather unusual responses. For example, when asked the reasons why we need policemen, he replied, 'To get rid of people like me.' He also revealed plans to blow up a large building in Kansas City [and] made bizarre derogatory sexual comments towards women prior to visits with his mother. He had episodes of hyperventilation and passed out by fainting or chest squeezing. . . . On one occasion in September of 1981, he put gasoline into a toilet and set fire to it, causing an explosion. Mr. Wilkins' brother was diagnosed to be suffering from schizophrenia when he was admitted along with Mr. Wilkins in 1982 at Crittenton Center. Mr. Wilkins was often noticed to be fantasizing about outer space and supernatural powers. In the fall of 1982, [the Crittenton psychiatrist] recommended placement on Mellaril because of a 'disoriented thinking pattern and high anxiety.' In 1983, his condition started deteriorating. . . . His final diagnoses in November of 1983 when he was discharged from Crittenton were Borderline Personality and Passive-Aggressive Personality. Psychological testing at Crittenton indicated isolated episodes of paranoid functioning." *Id.*, at 57–61.

imposition of capital punishment under our precedents concerning the Eighth Amendment proportionality principle. The individualized consideration of an offender's youth and culpability at the transfer stage and at sentencing has not operated to ensure that the only offenders under 18 singled out for the ultimate penalty are exceptional individuals whose level of responsibility is more developed than that of their peers. In that circumstance, I believe that the same categorical assumption that juveniles as a class are insufficiently mature to be regarded as fully responsible that we make in so many other areas is appropriately made in determining whether minors may be subjected to the death penalty. As we noted in *Thompson,* 487 U. S., at 825–826, n. 23, it would be ironic if the assumptions we so readily make about minors as a class were suddenly unavailable in conducting proportionality analysis. I would hold that the Eighth Amendment prohibits the execution of any person for a crime committed below the age of 18.

## IV

Under a second strand of Eighth Amendment inquiry into whether a particular sentence is excessive and hence unconstitutional, we ask whether the sentence makes a measurable contribution to acceptable goals of punishment. *Thompson, supra,* at 833; *Enmund* v. *Florida,* 458 U. S., at 798; *Coker* v. *Georgia,* 433 U. S., at 592; *Gregg* v. *Georgia,* 428 U. S., at 173. The two "principal social purposes" of capital punishment are said to be "retribution and the deterrence of capital crimes by prospective offenders." *Gregg, supra,* at 183; see *Enmund,* 458 U. S., at 798. Unless the death penalty applied to persons for offenses committed under 18 measurably contributes to one of these goals, the Eighth Amendment prohibits it. See *ibid.*

"[R]etribution as a justification for executing [offenders] very much depends on the degree of [their] culpability." *Id.,* at 800. I have explained in Part III, *supra,* why I believe juveniles lack the culpability that makes a crime so ex-

treme that it may warrant, according to this Court's cases, the death penalty; and why we should treat juveniles as a class as exempt from the ultimate penalty. These same considerations persuade me that executing juveniles "does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts." *Id.*, at 801. See *Thompson, supra,* at 836–837. A punishment that fails the Eighth Amendment test of proportionality because disproportionate to the offender's blameworthiness by definition is not justly deserved.

Nor does the execution of juvenile offenders measurably contribute to the goal of deterrence. Excluding juveniles from the class of persons eligible to receive the death penalty will have little effect on any deterrent value capital punishment may have for potential offenders who are over 18: these adult offenders may of course remain eligible for a death sentence. The potential deterrent effect of juvenile executions on adolescent offenders is also insignificant. The deterrent value of capital punishment rests "on the assumption that we are rational beings who always think before we act, and then base our actions on a careful calculation of the gains and losses involved." Gardiner, The Purposes of Criminal Punishment, 21 Mod. L. Rev. 117, 122 (1958). As the plurality noted in *Thompson, supra,* at 837, "[t]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." First, juveniles "have less capacity . . . to think in long-range terms than adults," Task Force 7, and their careful weighing of a distant, uncertain, and indeed highly unlikely consequence prior to action is most improbable.[15] In addition, juveniles have little

---

[15] See, *e. g.,* Kastenbaum, Time and Death in Adolescence, in The Meaning of Death 99, 104 (H. Feifel ed. 1959). Among the conclusions Kastenbaum drew from his study were that "[t]he adolescent lives in an intense present; 'now' is so real to him that both past and future seem pallid by

fear of death, because they have "a profound conviction of their own omnipotence and immortality." Miller, Adolescent Suicide: Etiology and Treatment, in 9 Adolescent Psychiatry 327, 329 (S. Feinstein, J. Looney, A. Schwartzberg, & A. Sorosky eds. 1981). See also, *e. g.*, Gordon, The Tattered Cloak of Immortality, in Adolescence and Death 16, 27 (C. Corr & J. McNeil eds. 1986) (noting prevalence of adolescent risk taking); Brief for American Society for Adolescent Psychiatry et al. as *Amici Curiae* 5–6 (citing research). Because imposition of the death penalty on persons for offenses committed under the age of 18 makes no measurable contribution to the goals of either retribution or deterrence, it is "nothing more than the purposeless and needless imposition of pain and suffering," *Coker, supra,* at 592, and is thus excessive and unconstitutional.

## V

There are strong indications that the execution of juvenile offenders violates contemporary standards of decency: a majority of States decline to permit juveniles to be sentenced to death; imposition of the sentence upon minors is very unusual even in those States that permit it; and respected organizations with expertise in relevant areas regard the execution of juveniles as unacceptable, as does international opinion. These indicators serve to confirm in my view my conclusion that the Eighth Amendment prohibits the execution of persons for offenses they committed while below the age of 18, because the death penalty is disproportionate when applied to such young offenders and fails measurably to serve the goals of capital punishment. I dissent.

---

comparison. Everything that is important and valuable in life lies either in the immediate life situation or in the rather close future." *Ibid.*

River Project Agricultural Improvement and Power District by *John B. Weldon, Jr.*, and *Stephen E. Crofton;* for the village of Ruidoso by *Neil C. Stillinger* and *Kathleen R. Marr;* and for the Shoshone-Bannock Tribes by *Jeanette Wolfley.*