Lundberg Stratton, J.,
concurring.
{¶ 343} Lang brutally murdered two people during an attempted robbery of a drug dealer. In many respects, Lang is no more sympathetic than the defendant *561 in State v. Ketterer, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, who brutally murdered a family friend. But I question their culpability because the two capital defendants share a common bond — mental illness. Ketterer suffered from bipolar disorder. Id. at ¶ 172. While Lang’s defense never actually introduced documentation of his diagnoses, clearly, at a minimum, Lang suffered from depression as a child, evidenced by his prescriptions for Depakote, Lithium, and the antipsychotic medicine Risperdal, and as evidenced by his frequent stays in psychiatric facilities.
{¶ 344} In Ketterer, I wrote that I believed that the time had come to reexamine whether we as a society should administer the death penalty 'to a person with a serious mental illness. Ketterer, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 212 (Lundberg Stratton, J., concurring). Because I continue to adhere to that belief, I write separately, five years later, to continue to encourage our General Assembly to take up this critical issue.
Facts
{¶ 345} Like Ketterer, Lang was seriously abused by his father as a child. Lang’s parents met when his father was his mother’s landlord. Lang’s mother was a single parent and could not pay her rent. Lang’s father traded her a place to live for sex. Lang’s father was a drug addict who beat Lang’s mother, even when she was pregnant. Eventually, Lang and his mother received a brief respite from Lang’s father when he was incarcerated for beating and stabbing Lang’s mother and setting fire to their apartment. Lang’s father also served time in prison for child molestation.
{¶ 346} The damage inflicted on Lang by this turbulent and violent childhood is probably best illustrated by what was in essence a kidnapping that he suffered at the hands of his father. At age ten, Lang went for a court-ordered two-week visit with his father out of state but was held by his father for two years. Lang’s mother testified that after repeated, unsuccessful attempts to find her son, she found him two years later malnourished and emaciated, weighing about 88 pounds, and wearing the shirt and shoes he had left in. Despite its being December in Maryland, he had no coat or warm clothes. When Lang’s mother took him to buy new clothes, she discovered that his body showed physical abuse. Lang had bruises, a gash on his hand, and an unmistakable cigarette burn on his back.
{¶ 347} Before he left to see his father, Lang had been treated for depression and was on three psychotropic drugs. During his forced stay with his father, Lang’s father refused to obtain refills for Lang’s medications. Not surprisingly, after two years apart from his mother, Lang was withdrawn when he returned home. He kept to himself and refused to discuss the ordeal or any of what had happened to him in those two years. For the next several years, Lang received *562 extensive psychiatric treatment. Lang made 28 visits to Sheppard Pratt, a psychiatric facility, usually staying for two weeks at a time. Twice he spent 90 days at the Bridges Program. He spent a full year at Woodburn Respiratory Treatment Center. Lang’s mother testified that her older son, Mendez, told her that Lang’s father had sexually abused Lang.
{¶ 348} As both parties noted, the mitigation evidence was compelling, but unsupported. Two lay witnesses testified on Lang’s behalf, but they did not present any documents, medical reports, or other evidence. Lang’s half-sister and mother testified about his turbulent family life, and his mother testified how Lang’s father had kept him for two years without allowing her to see him. Both witnesses testified to, but did not provide any other evidence of, Lang’s mental state. The state noted to the jury that both witnesses had ample reason to lie and that without any proof, the testimony should be dismissed as mere speculation. The defense hired Dr. Jeffrey Smalldon as its mitigation expert, but did not have him testify. It is of concern that Lang was repeatedly hospitalized for extensive psychiatric treatment over a period of years, yet no clear mental-health diagnosis appears in the record-symbolic of a failure of the system.
Evolving Standards of Decency that Mark the Progress of a Maturing Society
{¶ 349} In Ketterer, as here, I noted that guilt is not at issue. Ketterer, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 228 (Lundberg Stratton, J., concurring). Also as in Ketterer, I am concurring rather than dissenting because the court’s sentence of death is authorized under our current law. Id. But as in Ketterer, I continue to believe that we as a society should reexamine current law. Id.
{¶ 350} “ ‘The legislators who passed our current death penalty laws did not intend to force grotesque issues to the center stage of constitutional adjudication. The death penalty was supposed to be about getting even with Charles Manson and Ted Bundy, not executing teenagers and the retarded, or wrestling condemned schizophrenics to the gurney for forced doses of Haldol. But here we are.’ ” Mello, Executing the Mentally Ill (2007), 22 Crim.Just. 30, quoting David Bruck, a clinical professor of law and director of the Virginia Capital Case Clearinghouse at Washington and Lee University School of Law.
{¶ 351} “[TJhese questions go to the core of our legal system of death: Who, and why, do we execute? The problem of the intersection between mental illness and capital punishment isn’t rocket science. It’s much harder than that.” Id. at 31.
{¶ 352} Two recent United States Supreme Court rulings barring execution of juvenile offenders and people with mental retardation seem to give hope that *563 others with diminished capacity for judgment will also be spared the fate of a punishment that they may not even comprehend. Malone, Cruel and Inhumane: Executing the Mentally 111, Amnesty International Magazine (Mar. 27, 2007) at http://amnestyusa.org/node/87240. Although neither court case addresses persons with mental illness, Victor Streib, an Ohio Northern University law professor, quoted 11 times by the United States Supreme Court in Roper v. Simmons (2005), 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1, notes, “If certain mentally ill defendants think and act like juveniles or the mentally retarded, then they should be excluded from death row.” Id.

Unconstitutionality of Executing Persons with Mental Retardation/Developmental Disabilities

{¶ 353} In 1989, the United States Supreme Court held that the Eighth Amendment to the United States Constitution did not mandate a categorical exemption from the death penalty for mentally retarded offenders.[3] Penry v. Lynaugh (1989), 492 U.S. 302, 335, 109 S.Ct. 2934, 106 L.Ed.2d 256. At the time, the court noted that only two states had enacted laws banning the imposition of the death penalty on a mentally retarded person convicted of a capital offense. Id. at 334. Penry held that those two state enactments, “even when added to the 14 States that have rejected capital punishment completely, do not provide sufficient evidence at present of a national consensus.” Id.
{¶ 354} Thirteen years later, the court reconsidered the constitutionality of executing mentally retarded capital offenders. In Atkins v. Virginia (2002), 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335, the court noted that “standards of decency” had evolved since Penry and now demonstrate that the execution of the mentally retarded is cruel and unusual punishment. Atkins noted, “[I]n the 13 years since we decided Penry * * *, the American public, legislators, scholars, and judges have deliberated over the question whether the death penalty should ever be imposed on a mentally retarded criminal. The consensus reflected in those deliberations informs our answer to the question presented by this case.” Id. at 307.
{¶ 355} Atkins noted the many state legislatures across the country since Penry that had begun to address the issue. Citing several states, the court held, “It is not so much the number of these States that is significant, but the *564 consistency of the direction of change.” Id. at 315. The court noted that when Atkins was decided, only a minority of states permitted the practice, and even in those states, it was rare. Id. at 314-315. Therefore, evolving standards of decency compelled the conclusion that execution of mentally retarded offenders “has become truly unusual and it is fair to say that a national consensus has developed against it.” Id. at 316.

Unconstitutionality of Executing Juveniles

{¶ 356} Another category of persons whose eligibility for execution has rightly caused much consternation for the United States Supreme Court is juveniles. In Stanford v. Kentucky (1989), 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306, the court held that contemporary standards of decency in this country did not proscribe the execution of juvenile offenders who were over 15 but under 18 when they committed their crimes. Id. at 370-371. Stanford had noted that 22 of the 37 death-penalty states permitted the death penalty for 16-year-old offenders, and among those 37 states, 25 permitted it for those who had offended at 17 years old. These numbers, in the court’s view, indicated no national consensus “sufficient to label a particular punishment cruel and unusual.” Id. at 371.
{¶ 357} Sixteen years later, the court reconsidered that issue and held that the Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed. Roper, 543 U.S. at 568, 125 S.Ct. 1183, 161 L.Ed.2d 1. The court noted, “The evidence of national consensus against the death penalty for juveniles is similar, and in some respects parallel, to the evidence Atkins held sufficient to demonstrate a national consensus against the death penalty for the mentally retarded. When Atkins was decided, 30 states prohibited the death penalty for the mentally retarded. This number comprised 12 that had abandoned the death penalty altogether, and 18 that maintained it but excluded the mentally retarded from its reach. By a similar calculation in this case, 30 States prohibit the juvenile death penalty, comprising 12 that have rejected the death penalty altogether and 18 that maintain it but, by express provision or judicial interpretation, exclude juveniles from its reach.” (Citation omitted.) Id. at 564.
{¶ 358} Again, Roper noted the “ ‘consistency of the direction of change.’ ” Id. at 566, 125 S.Ct. 1183, 161 L.Ed.2d 1, quoting Atkins, 536 U.S. at 315, 122 S.Ct. 2242, 153 L.Ed.2d 335. “As in Atkins, the objective indicia of consensus in this case — the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice — provide sufficient evidence that today *565 our society views juveniles, in the words Atkins used respecting the mentally retarded, as ‘categorically less culpable than the average criminal.’ ” Roper at 567, 125 S.Ct. 1183, 161 L.Ed.2d 1, citing Atkins at 316, 122 S.Ct. 2242, 153 L.Ed.2d 335.
The Case for Banning Execution of Persons with Severe Mental Illness
{¶ 359} Although it is unconstitutional to execute someone who is incompetent at the time of his or her execution, see Ford v. Wainwright (1986), 477 U.S. 399, 417-418, 106 S.Ct. 2595, 91 L.Ed.2d 335, and Panetti v. Quarterman (2007), 551 U.S. 930, 934, 127 S.Ct. 2842, 168 L.Ed.2d 662, the United States Supreme Court has not yet decided whether it is unconstitutional to execute someone who suffered from a serious mental illness at the time of the crime. If executing persons with mental retardation/developmental disabilities or executing juveniles offends “evolving standards of decency,” Roper, 543 U.S. at 563, 125 S.Ct. 1183, 161 L.Ed.2d 1, then I simply cannot comprehend why these same standards of decency have not yet evolved to also prohibit execution of persons with severe mental illness at the time of their crimes.

Legislative Enactments and other Indications of our Evolving Standards of Decency

{¶ 360} Although not the groundswell noted in Atkins and Roper, since my concurrence in Ketterer in 2006, a few states have considered limiting the execution of those who were severely mentally ill at the time of the crime. Connecticut is the only state to prohibit execution of the mentally ill. Entzeroth, The Challenge and Dilemma of Charting a Course to Constitutionally Protect the Severely Mentally 111 Capital Defendant from the Death Penalty (2011), 44 Akron L.Rev. 529, 564. It exempts a capital defendant from execution if the jury or court finds that his or her “mental capacity was significantly impaired or the defendant’s ability to conform the defendant’s conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution.” Conn.Gen.Stat.Ann. 53a-46(a).
{¶ 361} Using language from the American Bar Association’s Recommendation 122A, legislators in Kentucky and North Carolina have introduced bills to bar the execution of defendants who, at the time of the offense, “had a severe mental disorder or disability that significantly impaired their capacity to (a) appreciate the nature, consequences, or wrongfulness of their conduct, (b) exercise rational judgment in relation to conduct, or (c) conform their conduct to the requirements of the law.” Kentucky H.B. No. 446, introduced in the 2009 regular session, and North Carolina H.B. 553/S.B. No. 1075 use nearly identical language.
{¶ 362} In addition, Indiana established the Bowser Commission to examine the execution of the mentally ill. The Bowser Commission issued a report in *566 November 2007 recommending the exemption of the severely mentally ill from the death penalty. Final Report of the Bowser Commission, Indiana Legislative Services Agency, November 2007, http://www.in.gov/legislative/interim/ committee/reports/BCOMABl.pdf, p. 3. In 2009, Indiana’s S.B. No. 22 was introduced to prohibit the imposition of the death penalty on an individual judicially determined to have had a severe mental illness, defined as schizophrenia, schizoaffective disorder, bipolar disorder, major depression, or delusional disorder, at the time of the crime, www.deathpenaltyinfo.org. See Entzeroth at 564.
{¶ 363} Finally, the Tennessee Disability Coalition reports that in 2011, Tennessee legislators introduced H.B. No. 2064 and S.B. No. 1692 to prohibit the execution of a person who had severe and persistent mental illness at the time of committing murder in the first degree, http://tn.disability.org.
{¶ 364} Moreover, at least five leading professional associations, the American Bar Association, the American Psychiatric Association, the American Psychological Association, the National Alliance on Mental Illness, and Mental Health America, have adopted policy statements recommending prohibition of execution of persons with severe mental illness at the time of the offense. Winick, The Supreme Court’s Evolving Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier (2009), 50 B.C.L.Rev. 785, 789.

The Crux of the Issue

{¶ 365} Mental Health America estimates that five to ten percent of all death row inmates suffer from a severe mental illness. Mental Health America, Death Penalty and People with Mental Illness, www.nmha.org/go/position-statements/54. In my view, a consensus is slowly growing to stop executing persons with severe mental illness. But excluding the severely mentally ill from death row involves a more complicated analysis. Juveniles and persons with mental retardation can be identified by a number, either an age or an IQ score and recognized factors. As I noted in my concurrence in Ketterer, “mental illness is not as easily quantified as mental retardation. Mental retardation is a fixed condition with more objective symptoms. Mental illness is a much broader category, with wide ranges of diagnoses and periods of decompensation and remission. Treatment options vary widely, including counseling, behavior modifications, group therapy, and medication. Some treatments and medications are controversial as to effectiveness and side effects. Mental illness as a defense is a difficult issue to quantify in a court of law. * * * Therefore, while I personally believe that the time has come for our society to add persons with severe mental illness to the category of those excluded from application of the death penalty, I believe that the line should be drawn by the General Assembly, not by a court. * * * [NJothing prevents the legislature from examining and using those * * * evolving standards [of decen *567 cy]. In fact, it is the legislature’s role to do so. Therefore, I urge our General Assembly to consider legislation setting the criteria for determining when a person with a severe mental illness should be excluded from the penalty of death. Unlike mental retardation, which can be determined by a number on an IQ test and other basic criteria, mental illnesses vary widely in severity. The General Assembly would be the proper body to examine these variations, take public testimony, hear from experts in the field, and fashion criteria for the judicial system to apply.” Ketterer, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 247-248 (Lundberg Stratton, J., concurring).
John D. Ferrero Jr., Stark County Prosecuting Attorney, and Ronald Mark Caldwell and Kathleen O. Tatarsky, Assistant Prosecuting Attorneys, for appellee.
Timothy Young, Ohio Public Defender, Joseph E. Wilhelm, Chief Counsel, Death Penalty Division, and Benjamin D. Zober, Jennifer A. Prillo, and Rachel Troutman, Assistant Public Defenders, for appellant.
Conclusion
{¶ 366} “ ‘A society that denies mental health care to those who need it the most and then subsequently executes them is cruel and inhumane at its very core. All of us need to be asking: “Is this the kind of society that we envision for ourselves?” My answer is that we can and must do better.’ ” Sue GunawardenaVaughn, Director of Amnesty International USA’s Program to Abolish the Death Penalty, quoted in Malone, Cruel and Inhumane: Executing the Mentally 111, Amnesty International Magazine, http://www.amnestyusa.org/node/87240.
{¶ 367} For these reasons, as well as those expressed in my concurrence in Ketterer, I reluctantly concur in the majority decision today, but I continue to fervently urge our General Assembly to take up the critical issue of whether, and/or under what circumstances, this state should continue to execute persons with varying degrees of mental illness.
Pfeifer and McGee Brown, JJ., concur in the foregoing opinion.

. This concurrence uses the term “mentally retarded” rather than the more recently acceptable term “persons with developmental disabilities,” because the term “mentally retarded” has been consistently used by the United States Supreme Court and other courts and has a legal significance. Penry, 492 U.S. at 344, 109 S.Ct. 2934, 106 L.Ed.2d 256 (Brennan, J., concurring in part and dissenting in part).