******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., with whom ROBINSON, J., joins, dissenting. I respectfully dissent. Until today, this court has never held that an interlocutory order that requires a determination of the best interests of the child was not immediately appealable. In fact, "[t]his court has a long history of concluding that, within the context of family matters, orders that would otherwise be considered interlocutory constitute appealable final judgments." *Khan* v. *Hillyer*, 306 Conn. 205, 213, 49 A.3d 996 (2012). The statute governing the discretionary transfer of cases from the juvenile matters docket to the regular criminal docket of the Superior Court, General Statutes (Supp. 2014) § 46b-127 (b) (1) (C),[1] requires the judge to consider, inter alia, whether "the best interests of the child and the public will not be served by maintaining the case in the superior court for juvenile matters." I see no reason to abandon our long-standing precedent of holding that an otherwise interlocutory order that involves a determination of the "best interests of the child" is immediately appealable where there is no clear legislative mandate to the contrary. Therefore, I respectfully dissent.

The majority holds that, in light of the genealogy of § 46b-127, coupled with the relevant legislative history, it is clear that the legislature did not intend for the discretionary transfer of a juvenile from juvenile court to adult court based upon a C, D, E or unclassified felony to be a final judgment. I disagree. The majority concludes that "the clear intent of the legislature is to prohibit interlocutory appeals from discretionary transfer orders." The majority continues: "We agree with the state that the legislature expressed a clear intent to prohibit the immediate appeal of discretionary transfer orders. As we explain herein, although the current statutory text of § 46b-127 does not resolve the question of whether a discretionary transfer order constitutes a final judgment for purposes of appeal, we conclude, on the basis of the genealogy of the transfer provisions, read together with this court's interpretation of the legislative intent evident from the prior amendments to those provisions, that under the current statutory language a discretionary transfer order cannot be immediately appealed. This interpretation of the discretionary transfer provision results in a harmonious and consistent body of law with respect to all of the transfer provisions currently contained in § 46b-127." I respectfully disagree.

Furthermore, I disagree with the majority's failure to analyze the question of whether an order under § 46b-127 (b) (1) is immediately appealable under *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983). Despite acknowledging that the statute is silent as to whether

the transfer order is immediately appealable, and acknowledging that it is necessary to resort to legislative history to interpret the statute, the majority fails to engage in the analysis required by *Curcio*.

In my view, statutory language currently set forth in § 46b-127 is completely different from previous versions, the legislative history is silent on the issue of the finality of the judgment, our philosophy toward juveniles has changed in recent years, and United States Supreme Court case law has changed. Furthermore, this court has routinely held that, where the best interests of the child are a consideration, an otherwise interlocutory ruling must be considered a final judgment. I disagree with the majority that reading § 46b-127 (b) (1) in connection with other transfer statutes mandates a conclusion that the legislature clearly intended that a transfer order under § 46b-127 (b) (1) is not immediately appealable. Rather, I would read § 46b-127 (b) (1) in a manner consistent with other statutes under which this court has considered the best interests of the child and uniformly held that otherwise interlocutory orders were immediately appealable under the second prong of *Curcio*. Therefore, I would conclude that since § 46b-127 (b) (1) is silent as to whether a transfer is immediately appealable, and that, under the second prong of *Curcio*, the discretionary transfer of a juvenile from the Superior Court for juvenile matters to adult court is immediately appealable because such a transfer so concludes the rights of the juveniles such that further proceedings cannot affect them. Accordingly, I would conclude that a juvenile may immediately appeal from an order under § 46b-127 (b) (1) and that the juvenile is entitled to a stay of that order pending appeal.

I agree with the factual and procedural history set forth by the majority in its opinion. I agree with the majority that, in the first instance, "[w]hether the legislature intended discretionary transfer orders issued pursuant to § 46b-127 (b) (1) to be final judgments for purposes of appeal presents a question of statutory interpretation over which we exercise plenary review. See *Ugrin* v. *Cheshire*, 307 Conn. 364, 379, 54 A.3d 532 (2012). When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpre-

tive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . *Kasica* v. *Columbia*, 309 Conn. 85, 93, 70 A.3d 1 (2013)." (Internal quotation marks omitted.)

I would add, however, the following regarding final judgments: "The jurisdiction of the appellate courts is restricted to appeals from judgments that are final. General Statutes §§ 51-197a and 52-263; Practice Book § [61-1] . . . . The policy concerns underlying the final judgment rule are to discourage piecemeal appeals and to facilitate the speedy and orderly disposition of cases at the trial court level. . . . The appellate courts have a duty to dismiss, even on [their] own initiative, any appeal that [they lack] jurisdiction to hear. . . . In some instances, however, it is unclear whether an order is an appealable final judgment. In the gray area between judgments which are undoubtedly final and others that are clearly interlocutory . . . this court has adopted the following test, applicable to both criminal and civil proceedings: An otherwise interlocutory order is appealable in two circumstances: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them. *State* v. *Curcio*, [supra, 191 Conn. 31]. . . . *Solomon* v. *Keiser*, 212 Conn. 741, 745–46, 562 A.2d 524 (1989)." (Internal quotation marks omitted.) *Canty* v. *Otto*, 304 Conn. 546, 554–55, 41 A.3d 280 (2012).

With these principles in mind, and in accordance with § 1-2z, I begin with the text of the statute. General Statutes (Supp. 2014) § 46b-127 (b) (1) provides as follows: "Upon motion of a prosecutorial official, the superior court for juvenile matters shall conduct a hearing to determine whether the case of any child charged with the commission of a class C, D or E felony or an unclassified felony shall be transferred from the docket for juvenile matters to the regular criminal docket of the Superior Court. The court shall not order that the case be transferred under this subdivision unless the court finds that (A) such offense was committed after such child attained the age of fourteen years, (B) there is probable cause to believe the child has committed the act for which the child is charged, and (C) the best interests of the child and the public will not be served by maintaining the case in the superior court for juvenile matters. In making such findings, the court shall consider (i) any prior criminal or juvenile offenses committed by the child, (ii) the seriousness of such offenses, (iii) any evidence that the child has intellectual disability or mental illness, and (iv) the availability of services in the docket for juvenile matters that can serve the child's needs. Any motion under this subdivision shall be made, and any hearing under this subdivision shall

be held, not later than thirty days after the child is arraigned in the superior court for juvenile matters." The statute itself then is silent as to whether it is a final judgment for purposes of appeal.

Nevertheless, when considering § 46b-127 (b) (1) in relation to the rest of that statute, I note that in General Statutes (Supp. 2014) § 46b-127 (f) the legislature did explicitly provide that "[t]he decision of the court concerning the transfer of a youth's case from the youthful offender docket, regular criminal docket of the Superior Court or any docket for the presentment of defendants in motor vehicle matters shall not be a final judgment for purposes of appeal." I would conclude that the legislature's decision to include language in § 46b-127 (f) explicitly providing that a transfer under that subsection is not a final judgment for purposes of appeal indicates that the legislature knows how to include such language if it chooses to do so, and the fact that it did not do so in § 46b-127 (b) (1) suggests that the legislature may have intended for the other transfers to be final judgments for purposes of an appeal. As we have frequently stated, "it is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly; e.g., *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 729, 6 A.3d 763 (2010); or to use broader or limiting terms when it chooses to do so. See, e.g., *Stitzer* v. *Rinaldi's Restaurant*, 211 Conn. 116, 119, 557 A.2d 1256 (1989)." *Scholastic Book Clubs, Inc.* v. *Commissioner of Revenue Services*, 304 Conn. 204, 219, 38 A.3d 1183, cert. denied,      U.S.     , 133 S. Ct. 425, 184 L. Ed. 2d 255 (2012).

The state asserts, however, that the absence of any language indicating that a transfer pursuant to § 46b-127 (b) (1) is a final judgment for purposes of appeal indicates that the legislature intended that it not be a final judgment for purposes of appeal. The state asserts that an interlocutory order is only appealable if the legislature chooses to make it so in the statutory language and we cannot read such language into a statute. Because I find that § 46b-127 (b) (1) is subject to two reasonable interpretations regarding whether a transfer pursuant to that section constitutes a final judgment for purposes of appeal, I would conclude that § 46b-127 (b) (1) is ambiguous, and, therefore, resort to legislative history and extratextual sources.

I begin with the history of § 46b-127 (b) (1). In *In re Juvenile Appeal (85–AB)*, 195 Conn. 303, 306, 488 A.2d 778 (1985), this court first considered whether an order transferring a case from the juvenile docket to the regular criminal docket was a final judgment for the purposes of appeal. In that case, this court held that such an order does not: (1) constitute a final judgment for the purpose of appellate review; or (2) fall within the exceptions to the final judgment rule outlined in *Curcio.*

Id., 306–307. At that time, the statute governing the discretionary transfer of juvenile cases to the regular criminal docket, General Statutes (Rev. to 1981) § 46b-126,[2] required a judge to determine that the juvenile had attained the age of fourteen, find probable cause, and determine that the nature of the charge qualified for transfer. I note that the respondent in *In re Juvenile Appeal (85–AB)* did not argue that the transfer order was a final judgment, only that one of the *Curcio* exceptions applied. *In re Juvenile Appeal (85–AB)*, supra, 307. It cannot be disputed that, since the date of that decision, American jurisprudence regarding juveniles has undergone tremendous change motivated by the prevailing scientific understanding of adolescents' cognitive development. As a result of this new understanding, Connecticut has now classified both sixteen year olds and seventeen year olds as juveniles. See Public Acts, Spec. Sess., June, 2007, No. 07-4, § 73.

The statute considered in *In re Juvenile Appeal (85–AB)*, General Statutes (Rev. to 1981) § 46b-126, like the current version of § 46b-127 (b) (1), contained no language indicating the legislature's intent to either permit or forbid interlocutory appeals of transfers. Accordingly, this court did not engage in any analysis of whether the legislature intended to allow interlocutory appeals, instead concluding that the transfer was not a final judgment and, therefore, should be analyzed under the exceptions to the final judgment rule set forth in *Curcio*.

Since our decision in the case of *In re Juvenile Appeal (85–AB)*, the legislature has made various changes to the statutory language governing the discretionary transfer of juvenile cases to the regular criminal docket. Initially, the legislature responded to this court's decision in *In re Juvenile Appeal (85–AB)* by adding explicit statutory language making such transfers immediately appealable. See Public Acts 1986, No. 86-185, § 1; see also *In re Michael S.*, 258 Conn. 621, 624 n.3, 784 A.2d 317 (2001). Specifically, the amendment added language providing that "[a]n order by the court under this section transferring a child from the docket for juvenile matters to the regular criminal docket of the superior court shall be a final judgment for purposes of appeal." Public Act 86-185, § 1.

In 1994, the legislature convened a special session to address gun violence and, therein, undertook a revision of the statute governing mandatory transfers in relation to certain gun related offenses. See Public Acts, Spec. Sess., July, 1994, No. 94-2, § 6. The revised statute did not explicitly bar interlocutory appeals, but omitted the final judgment language that the legislature had added in 1986. Spec. Sess. P.A. 94-2, § 6. In 1995, the legislature moved the statutory language governing discretionary transfers from § 46b-126 (a) to § 46b-127 (b). See footnote 2 of this opinion. In the course of making this

amendment, the legislature again chose to omit the final judgment language that was added in 1986. Public Acts 1995, No. 95-225, §§ 13 and 39. The majority suggests that the removal of the final judgment language from § 46b-127 indicates an intention by the legislature to abandon the final judgment rule it put into place in 1986. In many instances, I would find this argument persuasive. See *State* v. *Johnson*, 227 Conn. 534, 543, 630 A.2d 1059 (1993) ("[w]hen the legislature amends the language of a statute, it is presumed that it intended to change the meaning of the statute and to accomplish some purpose"). This court has recognized many times, however, that some statutory amendments may be structural or linguistic and not substantive. See *Gonsalves* v. *West Haven*, 232 Conn. 17, 24, 653 A.2d 156 (1995) (listing cases in which general rule presuming that legislature intended to change meaning of statute was not applied).

The 1986 amendment that made transfers subject to an interlocutory appeal evinced the intention of the legislature unequivocally; it added specific language to the more general statute that this court interpreted in *In re Juvenile Appeal (85–AB)* and, in so doing, reversed the effect of this court's decision. See *In re Michael S.*, supra, 258 Conn. 624 n.3. Had the legislature intended to reverse that clear policy, it could have replaced the final judgment language with phrasing indicating that juvenile transfers are not final judgments for purposes of appeal. See, e.g., General Statutes (Supp. 2014) § 46b-127 (f). As we have frequently stated, "it is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly . . . or to use broader or limiting terms when it chooses to do so." (Citation omitted.) *Scholastic Book Clubs, Inc.* v. *Commissioner of Revenue Services*, supra, 304 Conn. 219. Instead, the legislature simply returned to the nonspecific language that gave rise to *In re Juvenile Appeal (85–AB)*. This omission does little to suggest a clear legislative intention to abandon the prior rule. "In the interpretation of a statute, a radical departure from an established policy cannot be implied. It must be expressed in unequivocal language." *Jennings* v. *Connecticut Light & Power Co.*, 140 Conn. 650, 667, 103 A.2d 535 (1954).

I recognize, however, that the legislative history of the statutory language governing transfers may best be described as equivocal, with supportive arguments being offered on both sides of the issue depending upon the legislator whom one chooses as authority. For instance, we stated in *In re Michael S*, supra, 258 Conn. 630–31 n.11 as follows: "We note that the problem presented by aging juveniles was recognized by the legislature when it enacted Spec. Sess. P.A. 94-2, § 6, deleting the final judgment language from [the statute governing mandatory transfers]. During debate on the proposed legislation, Senator George Jepsen stated that the ability

to appeal from a transfer order 'has been the focus of much of the problems associated with Juvenile Court actions because by the time an appeal is taken, the juvenile is no longer a juvenile.' 37 S. Proc., Pt. 10, July 13, 1994, Spec. Sess., p. 3630. Representative Edward C. Graziani stated that 'when you take an appeal [from a transfer order], you can extend the period of time before a resolution is done. The child is typically over [sixteen by the time the appeal is decided], so the whole issue is moot. Therefore, the state's advocates do not proceed to try to even attempt under our existing law to get a transfer because the law is really defective. [Under this] new law . . . there is no appeal. You cannot appeal, so you cannot stop the clock when the system goes forward, so the child doesn't become [sixteen] before justice is followed through.' 37 H.R. Proc., Pt. 27, July 13, 1994 Spec. Sess., p. 9955." In contrast, when Representative Michael Lawlor, the cochairman of the Judiciary Committee, presented the bill to the House of Representatives, he said: "This bill does not in any significant way change the meaning of the juvenile transfer language." 37 H.R. Proc., supra, pp. 9786–87.

Further, when the legislature undertook a more comprehensive reform of the statutes governing the juvenile justice system the following year, the removal of the provision regarding interlocutory appeals from the statute governing discretionary transfers was never explicitly discussed. See 38 H.R. Proc., Pt. 8, 1995 Sess., pp. 2933–42, remarks of Representative Lawlor. In fact, during legislative debate on the 1995 reforms, Representative Dale Radcliffe, a vocal opponent of the initial version of the bill because it failed, in his view, to transfer enough children to adult court, criticized the amendment then under debate because the only thing it did to speed transfers was eliminate probable cause and competency hearings in juvenile court. Id., pp. 2956–57. It is certainly arguable that the implication of Representative Radcliffe's remarks was that he understood that the revisions being considered continued to allow interlocutory appeals. The fact that this understanding was shared by many of the other legislators is underscored by Representative Lawlor's failure to mention the fact that the elimination of the final appeal language from the provisions governing discretionary transfers would change a substantive part of the law, despite presenting the bill to the chamber and summarizing the provisions. Id., pp. 2933–42. Legislative debate surrounding subsequent revisions of and amendments to the juvenile transfer statute, including adoption of the iteration of the statute at issue in the present case, has not touched upon the question of interlocutory appeals.

On the basis of this legislative history, I would conclude that the intent of the legislature in removing the statutory language indicating that a transfer represented a final judgment for the purpose of an interlocu-

tory appeal is far from definitive. In my view, it is so unclear that we must resort to a *Curcio* analysis in order to determine if an appeal should be allowed. As I stated previously in this opinion, "[i]n some instances, however, it is unclear whether an order is an appealable final judgment. In the gray area between judgments which are undoubtedly final and others that are clearly interlocutory . . . this court has adopted the following test, applicable to both criminal and civil proceedings: An otherwise interlocutory order is appealable in two circumstances: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them. *State* v. *Curcio*, [supra, 191 Conn. 31]." (Citation omitted; internal quotation marks omitted.) *Solomon* v. *Keiser*, supra, 212 Conn. 746.

I also would conclude that, in view of the many judicial opinions and scientific studies which have changed the entire landscape of juvenile law, it is necessary to reevaluate our conclusions in *In re Juvenile Appeal (85–AB)*, which concluded that discretionary transfers pursuant to General Statutes (Rev. to 1981) § 46b-126 did not satisfy the second prong of *Curcio*, and *In re Daniel H.*, 237 Conn. 364, 367, 678 A.2d 462 (1996), which concluded that the legislature's decision to remove the final judgment language from the mandatory transfer provision "eliminated the right to an immediate appeal from a court order transferring a juvenile matter to the regular criminal docket . . . ." I disagree with the majority's reliance on *In re Daniel H.*, because that case addressed the statute for the mandatory transfer of juveniles and not the discretionary transfer statute involved in this case. The mandatory transfer provision, it must be stated, contains no language regarding the best interests of the child. My principal issue with the majority is that, in my view, this is an entirely new statute, with new findings to be made by the trial judge, which is different from statutes that this court has previously considered. It is important, in my opinion, that we examine this new statute through the current lens of evolving juvenile justice principles.

I would conclude that we must reexamine this court's *Curcio* analysis in *In re Juvenile Appeal (85–AB)* because, in the years since that opinion was issued, there have been numerous substantial changes to our understanding of juvenile justice principles. For instance, since that time, our nation has stopped executing people who were children when they committed their crimes. *Roper* v. *Simmons*, 543 U.S. 551, 568–69, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). We have stopped imposing sentences of life in prison without the possibility of parole upon people who were children when they committed their crimes. *Graham* v. *Florida*, 560 U.S. 48, 74, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). We have changed our state laws to recognize that sixteen

and seventeen year olds are still children, and should remain, whenever possible, within the jurisdiction of the juvenile court. See Spec. Sess. P.A. 07-4, § 73. All of these developments were erected on the foundation of a body of scientific knowledge not available to this court in 1985.

An examination of these seminal United States Supreme Court cases involving juvenile justice is instructive to our understanding of the changing views of juvenile justice. In *Roper* v. *Simmons*, supra, 543 U.S. 555–56, the United States Supreme Court reversed itself on a question, presented just sixteen years earlier in *Stanford* v. *Kentucky*, 492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989), of whether the eighth amendment to the United States constitution permits imposing the death penalty on a person convicted of a crime committed as a minor. In holding that the execution of such offenders was unconstitutional, the United States Supreme Court relied heavily on the large number of states that had abolished the execution of juvenile offenders since the *Stanford* ruling. *Roper* v. *Simmons*, supra, 568. In explaining this trend, the court cited three reasons: (1) "[A]s any parent knows and as the scientific and sociological studies . . . tend to confirm, [a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young"; (2) "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and (3) "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." (Internal quotation marks omitted.) Id., 569–70.

Two years after *Roper* was decided, Connecticut joined the vast majority of sister states in extending juvenile court jurisdiction to sixteen and seventeen year olds. See Spec. Sess. P.A. 07-4, § 73. An examination of the testimony considered by the legislature prior to enacting this change indicates that the legislature was attuned to the changing understanding of adolescence reflected in *Roper* and the nationwide trends noted therein. It also shows how much of the current information about adolescents was unavailable to this court when it decided *In re Juvenile Appeal (85–AB)*. In my view, if this information were available to this court when it decided that case in 1985, a different result would have been reached.

In *In re Juvenile Appeal (85–AB)*, supra, 195 Conn. 312–13, this court considered whether the exceptions to the final judgment rule set forth in *State* v. *Curcio*, supra, 191 Conn. 31–34, were applicable to juvenile transfer orders. As I explained previously in this opinion, *Curcio* establishes that "[a]n otherwise interlocutory order is appealable in two circumstances: (1) where the order or action terminates a separate and

distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them." Id., 31.

Tyriq T., the respondent in this case, does not claim that the first *Curcio* exception applies. The Court in *In re Juvenile Appeal (85–AB)* considered two arguments regarding the second prong of *Curcio*. First, it considered the loss of privacy because matters are held in public in the adult court as opposed to the privacy of the juvenile court. *In re Juvenile Appeal (85–AB)*, supra, 195 Conn. 307–308. Second, there was concern about the juveniles having direct contact with the adult prison population. Id., 310. The court held that the first ground did not satisfy the second prong of *Curcio* and assumed that the Department of Correction would provide children in its custody with age appropriate services or transfer them to any other appropriate state institution as their needs required. Id., 308 and 310 n.5.

In 2007, the legislature heard testimony from then Commissioner of Correction, Theresa Lantz, indicating that sixteen and seventeen year old children in the custody of the Department of Correction were not receiving developmentally appropriate services in the way they would if they were in the juvenile system, notwithstanding the creation of a special facility for them. Commissioner Lantz testified as follows: "I took all the [sixteen] and [seventeen] year olds out of the jails. . . . And we've tailored programs for that particular population. . . . And so one of the things that we've really tried to concentrate [on] is giving them specific programs, but we don't provide the same level of services that the juveniles get in the juvenile court system." Conn. Joint Standing Committee Hearings, Executive and Legislative Nominations, Pt. 1, 2007 Sess., pp. 229–30.

The admitted inadequacy of services provided to children held in the custody of the Department of Correction—even when they are segregated from adult prisoners—presents a very real risk of irreparable harm when considered in the context of the current understanding of the importance of the adolescent years to human cognitive and emotional development. "Adolescence is a crucial and necessary period of plasticity when brain circuitry and behavior are beginning to be established. These changes in brain circuitry and functioning that occur during adolescence most significantly impact brain regions associated with response inhibition, planning, the calibration of risk and reward, and emotion regulation. Moreover, the opportunities and constraints created by a child's environment play an important role in this period of development." (Footnotes omitted.) A. Giannetti, "The Solitary Confinement of Juveniles in Adult Jails and Prisons: A Cruel and Unusual Punishment," 30 Buff. Pub. Int. L.J. 31, 45–46 (2011–2012). "Once the developmental window passes

for a juvenile, the brain cannot go back and redevelop at some point in the future; the developmental effects are likely permanent." Id., 46–47.

It is important to note the long-term effects of the inadequate provision of services to the children when they are in adult detention. As Attorney Christina Ghio noted when she testified in 2007 on behalf of the Office of the Child Advocate in favor of legislation to raise the juvenile jurisdiction age: "The inadequacy of the adult criminal system to address the emotional and developmental needs of teenagers is substantiated through research demonstrating that youth incarcerated in adult facilities are more likely to reoffend and commit more serious crimes than youth who are tried and treated in the juvenile system for the same crimes." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 19, 2007 Sess., p. 6096. Research has shown that even facilities specifically designed for children tend to have suboptimal educational outcomes, and to provide inadequate ancillary services such as special education, social work, and psychology. See K. Burdick et al., "Creating Positive Consequences: Improving Education Outcomes for Youth Adjudicated Delinquent," 3 Duke F. for L. & Soc. Change 5, 10–12 (2011). The shortcomings of these resources often lead to greater high school dropout rates and greater subsequent involvement with the adult criminal justice system. Id., 13 n.50.

Legal developments subsequent to the change in the age of juvenile jurisdiction in Connecticut indicate that the evolution in legal understanding of the needs of adolescents has continued. First, in 2010, the United States Supreme Court ruled that life imprisonment without parole for crimes committed by juveniles was also unconstitutional. See *Graham* v. *Florida*, supra, 560 U.S. 74. In *Graham*, the United States Supreme Court relied in a large part on the reasoning of *Roper*, concluding that "[n]o recent data provide reason to reconsider the [c]ourt's observations in *Roper* about the nature of juveniles. As the petitioner's amici point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." Id., 68.

Then, in 2012, the Connecticut legislature provided the detailed procedure, at issue in this case, for determining which juvenile cases are transferred to the adult criminal docket. See Public Acts, Spec. Sess., June 2012, No. 12-1, § 280. This enactment made clear that hearings on discretionary transfers from juvenile court to adult court should occur, for the first time, in the juvenile court, rather than in the adult court as required by *State* v. *Fernandes*, 300 Conn. 104, 106, 12 A.3d 925, cert. denied, U.S. , 131 S. Ct. 2469, 179 L. Ed. 2d 1213 (2011). See id., 129–30 (*Eveleigh, J.*, dissenting). The reason for this change was reflected in the testimony of Judge Christine Keller to the Judiciary Commit-

tee in support of the bill: "We felt that, number one, that due process hearing should take place before they get over to adult court. We know what services are available in juvenile court. We know what we can apply to that child from the juvenile court array of services and diversions. We may know the child a lot better than the adult court, because we may have had the child in front of us previously. Probation, one of the differences between an adult court and a juvenile court is in juvenile court, a probation officer is assigned the minute the child walks into the courthouse . . . we don't wait until . . . the case is disposed of to assign a probation officer. So the juvenile judge would waive the totality of circumstances, the seriousness of the offense, the child's history with the juvenile court, and what we could do for the child in the juvenile court and then determine whether, okay, there's not much more we can do for this child, off they go to adult court or say, no, it's going to stay here on the discretionary transfers, not the most serious ones." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 13, 2012 Sess., pp. 4167–68.

As this testimony before the legislature demonstrates, because of the unique nature of juvenile court and the unique services provided there, a juvenile who is transferred from juvenile court to adult court suffers an irreparable harm. The harm suffered by a wrongly transferred juvenile is truly irreparable, for when "the developmental window passes for a juvenile, the brain cannot go back and redevelop at some point in the future." A. Giannetti, supra, 30 Buff. Pub. Int. L.J. 46–47. I would add that, in my view, the lack of privacy is irreparable. Once the juvenile has a public hearing he cannot go to a judge to retrieve his privacy. Further, we should not, in my view, ignore the fact that once the juvenile goes to adult court his conviction could result in a criminal record, unless he is granted youthful offender status. Certainly, the imposition of a criminal record on an individual is irreparable and is something for which the juvenile may suffer repercussions the rest of his life. A juvenile does not incur a criminal record in juvenile court. Once the transfer occurs the possibility of a criminal record exists. Further, the juvenile that is transferred to adult court may face the decision of having to post bond through a bail bondsman, which would result in an irreparable loss of money that would not be incurred in juvenile court. We have previously held an immediate appeal was appropriate because the order required the aggrieved party to engage in some coercive action, such as paying money that could not be recovered on a subsequent appeal. *Litvaitis* v. *Litvaitis*, 162 Conn. 540, 548–49, 295 A.2d 519 (1972) (concluding pendente lite order for payment of support was final judgment); *Hiss* v. *Hiss*, 135 Conn. 333, 336–38, 64 A.2d 173 (1949) (concluding pendente lite order for temporary support was final judgment). Certainly, the

juvenile would never have the opportunity to recover the funds needed to post bond. Further, if a juvenile in adult court cannot make bond, he will receive less frequent reviews of his detention. See Practice Book § 30-10 (requiring that juveniles receive detention review hearing every fifteen days). Hearings in the juvenile court also ensure that, to the court's satisfaction, the juvenile is receiving the proper services. The juvenile loses the use of the juvenile probation officer if a transfer is ordered.

As I explained previously in this opinion, General Statutes (Supp. 2014) § 46b-127 (b) (1) (C) requires that the court find, inter alia, that "the best interests of the child and the public will not be served by maintaining the case in the superior court for juvenile matters." It is this "best interests" finding that separates this statute from the youthful offender statute and makes any comparison to other transfer statutes inapposite. The youthful offender statute does not carry any "best interests of the child" language. In fact, it is difficult to conjure up a scenario when the best interests of the child would ever be served by a transfer to adult court given the absence of privacy, inadequate services and the possibility of a public record.

Further, the very presence of the best interests test is an important new element in any consideration under the second prong of *Curcio*. It is my position that this statute has changed so substantively that any resort to an analysis based upon its genealogy is misplaced. A hearing regarding the best interests of the child was simply not required in prior revisions of the statute. The adequacy of that hearing and the court's findings must be subject to appellate review before the transfer is completed. If there is no review at that time, in my view, the purpose and meaning of *Curcio* has become meaningless. In *State* v. *Fernandes*, supra, 300 Conn. 127, this court held that "[t]herefore, when, as here, treatment as a juvenile is the presumptive norm, and treatment as an adult is the exception, the right to juvenile status vests in the juvenile, and the discretionary transfer to criminal court, which is a revocation of juvenile status, constitutes a deprivation of a liberty interest cognizable under the due process clause." In order to protect these due process rights the legislature now requires that the court consider, as one of the requirements of transfer, that the best interests of the child will not be served by maintaining him in the juvenile system. This required finding represents a sea change in the statute that did not exist when: (1) we decided *In re Juvenile Appeal (85–AB)*; (2) the 1994 or 1995 amendments were passed; or (3) we decided *In re Daniel H*. Therefore, any reliance on those cases, or on the genealogy of § 46b-127 (b) (1), is misplaced and it is more appropriate to engage in an analysis under *Curcio*.

We have previously determined that orders of temporary custody under General Statutes § 46b-56, which require a finding on the best interests of the child, are immediately appealable. *Madigan* v. *Madigan*, 224 Conn. 749, 750–51, 620 A.2d 1276 (1993). In considering orders for temporary custody under § 46b-56, this court has stated that "we consider orders of temporary custody in light of these constitutional considerations and reaffirm our conclusion that an immediate appeal of [a court order of temporary custody] is the only reasonable method of ensuring that the important rights surrounding the parent-child relationship are adequately protected." (Internal quotation marks omitted.) *In re Shamika F.*, 256 Conn. 383, 404, 773 A.2d 347 (2001). This court continued: "[T]he best interest of the children, especially their interest in family stability, supports our analysis. . . . Therefore, we conclude that temporary custody orders are immediately appealable not only to protect a parent's interests in their children, but also to protect the individual interests of the children." Id., 405–406. Likewise, in *In re Jeisean M.*, 270 Conn. 382, 404–405, 852 A.2d 643 (2004), this court held that an extension of commitment, which also requires a factual finding regarding the child's best interests, is an immediately appealable final judgment.

As the foregoing demonstrates, this court has routinely determined that, where the individual best interests of a child are concerned, orders affecting those interests are appealable final judgments. This is the harmonious body of law which, in my view, we should maintain. In fact, my research has not revealed a case involving a statute that contained language regarding the "best interests" of a child in which this court has not allowed an immediate appeal from an interlocutory order of any kind. Certainly, the revocation of juvenile status, which we have held to be a liberty interest; see *State* v. *Fernandes*, supra, 300 Conn. 111; must constitute an appealable judgment under *Curcio*. Indeed, once the juvenile is transferred he loses valuable services and his privacy. Further, he loses the right to have his detention reviewed every fifteen days. He may lose the right to be released to his parents or guardian, or other suitable person or agency without the possibility of having to incur the expense of posting a bond, which may or may not become problematic. In this case, the required finding regarding best interest was recently added to the statute. When a court makes a ruling that may affect those interests, it follows that *Curcio* requires that ruling to constitute an appealable final judgment.

The opinion of the majority, in my view, leads to the absurd result that before a juvenile can challenge a judge's decision to transfer the juvenile to adult court, the juvenile must give up his or her right to privacy, be hindered by a public criminal record, and give up

valuable services that may aid his or her development while an appeal is pending. The majority contends that this result is mandated by the deletion of the final judgment wording in the statute. As noted earlier, I respectfully disagree with this conclusion because the wording of this statute is completely different from the earlier versions, and both our case law and our acceptance of scientific studies regarding juveniles mandate a different result. There are specific findings which now must be made by the trial court prior to ordering the transfer. What if, for instance, the judge failed to make the best interest finding, yet ordered the transfer to adult court? Is the majority's position such that a juvenile would have to wait for a trial in adult court before the juvenile could appeal the judge's clear error committed in juvenile court? The consequences of such a result are much too severe for the juvenile and, in my view, directly contrary to the intent of *Curcio*.

During legislative debates in 1994, some of the legislators remarked that the final judgment clause should be removed from the mandatory transfer provision because the transfer appeals took too long. It is noteworthy that the appellate system of the Judicial Branch of this state has recognized this deficiency and instituted a system in which all juvenile appeals are expedited and the number of extensions has been significantly reduced. Presently, the average case takes a total of approximately six months from the time the appeal is filed until the appellate decision. In the Appellate Court the period is 185.94 days. In the Supreme Court the period is 183.44 days. These statistics demonstrate a vast improvement in the time period within which an appeal involving juvenile matters is presently heard.[3] In the present case, the respondent was transferred to adult court on November 15, 2012. The order was not stayed. At the time of oral argument on March 20, 2014, his case still had not been heard in adult court. He has lost sixteen months of services he could have had in juvenile court. He has also lost the benefit of having sixteen months of supervision by a juvenile probation officer. His hearings have been open to the public, and he now faces the possibility of having a criminal record. How could this transfer have possibly been in his best interests? If indeed, the 1994 act omitted the provision providing for an immediate appeal from mandatory transfers was because those appeals took too long, the pendulum has swung 180 degrees; in the absence of a speedy trial motion, it takes far longer to try the juvenile in adult court, compared to the time in which the juvenile could have an appeal heard in the appellate system.

I would, therefore, conclude that the discretionary transfer order of a juvenile from the Superior Court for juvenile matters to the Superior Court for adult matters meets the second prong of *Curcio* and, therefore, is an appealable interlocutory order. In view of the potential

irreparable harm to the juvenile, I would conclude that a stay should be in place while the appeal is pending, and the juvenile should continue to receive juvenile services during the course of the appeal. He should also continue to be supervised by his juvenile probation officer. The effect on both the juvenile and his or her family is too devastating to allow a discretionary order to languish while the juvenile endures a criminal trial without the benefit of having the transfer order reviewed by an appellate court.

I would conclude both that the order was an appealable final judgment under *Curcio* and that the best interests of the juvenile demanded that he stay within the jurisdiction of the Superior Court for juvenile matters while the appeal was pending. Accordingly, I would reverse the judgment of the Appellate Court. Therefore, I respectfully dissent.

[1] As the majority notes, § 46b-127 has recently been amended in a manner not relevant to the present appeal. See footnote 1 of the majority opinion; see also Public Acts 2013, No. 13-258, § 5. Hereinafter, unless otherwise noted, all references to § 46b-127 are to the version appearing in the 2014 supplement to the General Statutes.

[2] As noted by the majority, the legislature moved the statutory provision governing discretionary transfers from § 46b-126 (a) to § 46b-127 (b) in 1995. See Public Acts 1995, No. 95-225, §§ 13 and 39.

[3] Obviously, in the vast minority of juvenile cases in which certification is granted from the Appellate Court to the Supreme Court, which represents a very small percentage of the overall statistics, the time period from filing to decision is longer.